# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-4021

_____

Republican Party of Minnesota, an
association; Indian Asian American
Republicans of Minnesota, an
association; Republican Seniors, an
association; Young Republican League
of Minnesota, a Minnesota nonprofit
corporation; Minnesota College
Republicans, an association,

      Plaintiffs - Appellants,

Gregory F. Wersal, individually,

      Plaintiff,

Cheryl L. Wersal, individually; Mark E.
Wersal, individually; Corwin C.
Hulbert, individually,

      Plaintiffs - Appellants,

Campaign for Justice, an association,

      Plaintiff,

Minnesota African American Republic
Council, an association,

      Plaintiff - Appellant,

Muslim Republicans, an association;

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Appeals from the United States
District Court for the District
of Minnesota.

Michael Maxim, individually; Kevin J.      *
Kolosky, individually,                     *
                                           *
    Plaintiffs,        *
                                           *
    v.                 *
                                           *
Suzanne White, in her capacity as          *
Chairperson of the Minnesota Board on      *
Judicial Standards, or her successor;      *
Kenneth L. Jorgensen, in his capacity as   *
Director of the Minnesota Office of        *
Lawyers Professional Responsibility, or    *
his successor; Charles E. Lundberg,        *
in his capacity as Chair of the            *
Minnesota Lawyers Professional             *
Responsibility Board, or his               *
successor,                                 *
                                           *
    Defendants - Appellees,      *
                                           *
     ————————————              *
                                           *
Minnesota Civil Liberties Union,           *
                                           *
    Amicus on Behalf of Appellant,      *
                                           *
The Minnesota State Bar Association;       *
The Conference of Chief Justices; The      *
Missouri Bar; The Brennan Center for       *
Justice at NYU School of Law;              *
Campaigns for People; Citizen              *
Action/Illinois; Conference of            *
Ad Hoc Committee of Former Justices        *
and Friends; State of Arkansas;            *
Arkansas Supreme Court,                    *
                                           *
    Amici on Behalf of Appellees.      *

-2-

| | |
|---|---|
| Republican Party of Minnesota, an association; Indian Asian American Republicans of Minnesota, an association; Republican Seniors, an association; Young Republican League of Minnesota, a Minnesota nonprofit corporation; Minnesota College Republicans, an association; Minnesota African American Republic Council, an association; Cheryl L. Wersal, individually; Mark E. Wersal, individually; Corwin C. Hulbert, individually; Gregory F. Wersal, individually; Campaign for Justice, an association; Muslim Republicans, an association, | * * * * * * * * * * * * * * * * |
| | * |
| Plaintiffs, | * |
| | * |
| Michael Maxim, individually, | * |
| | * |
| Plaintiff - Appellant, | * |
| | * |
| Kevin J. Kolosky, individually, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| Suzanne White, in her capacity as Chairperson of the Minnesota Board on Judicial Standards, or her successor; Kenneth L. Jorgensen, in his capacity as | * * * * |

-3-

Director of the Minnesota Office of    *
Lawyers Professional Responsibility, or   *
his successor; Charles E. Lundberg, in   *
his capacity as Chair of the Minnesota   *
Lawyers Professional Responsibility    *
Board, or his successor,               *
                                    *

      Defendants - Appellees,     *
                                    *
                                    *

The Minnesota State Bar Association,    *
                                    *

      Amicus on Behalf of Appellee,    *
                                    *

The Conference of Chief Justices;     *
The Missouri Bar; The Brennan Center   *
for Justice at NYU School of Law;     *
Campaigns for People; Citizen Action/   *
Illinois; Conference of Ad Hoc       *
Committee of Former Justices and     *
Friends; State of Arkansas; Arkansas    *
Supreme Court,                   *
                                    *

      Amici on Behalf of Appellees.    *

                               _____

                               No. 99-4029

                               _____

Republican Party of Minnesota, an     *
association; Indian Asian American     *
Republicans of Minnesota, an        *
association; Republican Seniors, an     *
association; Young Republican League   *
of Minnesota, a Minnesota nonprofit    *
corporation; Minnesota College       *
Republicans, an association,         *
                                    *

Plaintiffs,                                          *
                                                     *
Gregory F. Wersal, individually,                     *
                                                     *
    Plaintiff - Appellant,       *
                                                     *
Cheryl L. Wersal, individually; Mark E.              *
Wersal, individually; Corwin C.                      *
Hulbert, individually,                               *
                                                     *
    Plaintiffs,                   *
                                                     *
Campaign for Justice, an association,                *
                                                     *
    Plaintiff - Appellant,        *
                                                     *
Minnesota African American Republic                  *
Council, an association; Muslim                       *
Republicans, an association; Michael                 *
Maxim, individually,                                 *
                                                     *
    Plaintiffs,                   *
                                                     *
Kevin J. Kolosky, individually,                      *
                                                     *
    Plaintiff - Appellant,        *
                                                     *
    v.                            *
                                                     *
Suzanne White, in her capacity as                    *
Chairperson of the Minnesota Board on                *
Judicial Standards, or her successor;                *
Kenneth L. Jorgensen, in his capacity as             *
Director of the Minnesota Office of                  *
Lawyers Professional Responsibility, or              *
his successor; Charles E. Lundberg, in               *
his capacity as Chair of the Minnesota               *
Lawyers Professional Responsibility                  *

Board, or his successor,                    *
                                            *
        Defendants - Appellees,             *
                                            *
_____                     *
                                            *
The Minnesota State Bar Association,        *
                                            *
        Amicus on Behalf of Appellees,      *
                                            *
The Conference of Chief Justices;           *
The Missouri Bar; The Brennan Center        *
for Justice at NYU School of Law;           *
Campaigns for People; Citizen Action/       *
Illinois; Conference of Ad Hoc              *
Committee of Former Justices and            *
Friends; State of Arkansas; Arkansas        *
Supreme Court,                              *
                                            *
        Amici on Behalf of Appellees.       *

                        _____

                Submitted: October 20, 2004
                 Filed: August 2, 2005

                        _____

Before LOKEN, Chief Judge, McMILLIAN, JOHN R. GIBSON, WOLLMAN,
    BEAM, MORRIS SHEPPARD ARNOLD, MURPHY, BYE, RILEY, SMITH,
    COLLOTON, GRUENDER, and BENTON, Circuit Judges, en banc.

                        _____

BEAM, Circuit Judge.

        This case is before us en banc upon remand from the United States Supreme
Court. We briefly outline what has occurred in this matter since its inception,
believing that it will be helpful in analyzing the issues presented.

The dispute commenced in the United States District Court for the District of Minnesota. At issue were the so called "announce," "partisan-activities," and "solicitation" clauses of Canon 5 of the Minnesota Supreme Court's canons of judicial conduct. The district court rejected Appellants' First and Fourteenth Amendment claims, Republican Party of Minn. v. Kelly, 63 F. Supp. 2d 967 (D. Minn. 1999), and granted summary judgment to Appellees: the Minnesota Board on Judicial Standards, the Minnesota Lawyers Professional Responsibility Board, and the Minnesota Office of Lawyers Professional Responsibility. Id. at 986. On appeal, a divided panel of this court affirmed the district court. Republican Party of Minn. v. Kelly, 247 F.3d 854 (8th Cir. 2001). We denied Appellants' en banc suggestion. The Supreme Court granted certiorari and held, Republican Party of Minn. v. White, 536 U.S. 765 (2002), that the announce clause violates the First Amendment, reversing our holding in Kelly. The Court remanded the case for further proceedings consistent with its opinion. Id. at 788. Upon remand, the same panel, divided as before, again affirmed the district court's ruling on the solicitation clause and remanded for further consideration in light of White of the partisan-activities clause. Republican Party of Minn. v. White, 361 F.3d 1035 (8th Cir. 2004) (vacated). We granted Appellants' request for en banc review, vacating the panel opinion. Today, we find that the partisan-activities and solicitation clauses also violate the First Amendment. Accordingly, we reverse the district court and remand the case with instructions to enter summary judgment in favor of Appellants.

The Supreme Court's remand requires us to consider two issues in light of White: the constitutional viability of the partisan-activities and solicitation clauses of Canon 5.[1]

In doing so, we give no deference to earlier panel opinions.

_____

[1]Since our ruling today essentially moots any viable Fourteenth Amendment claims, we leave them for consideration on another day, if necessary.

> [L]egal propositions which an appellate court settles on appeal ordinarily cannot be questioned again, . . . . A corollary to [this principle] is the rule that, upon a reversal and remand for further consistent proceedings, the case goes back . . . for a new determination of the issues presented as though they had not been determined before, pursuant to the legal principles enunciated in the appellate court's opinion, which must be taken as the law of the case.

Poletti v. C.I.R., 351 F.2d 345, 347 (8th Cir. 1965). Thus, our task is to take the "legal principles enunciated in" White and apply them to the partisan-activities and solicitation clauses for a determination of these claims "as though they had not been determined before." Id. And that is what we have done.

## I. BACKGROUND

Canon 5A(1) and 5B(1), the partisan-activities clause, and B(2), the solicitation clause, rein in the political speech and association of judicial candidates in Minnesota. The partisan-activities clause states, in relevant part:

> Except as authorized in Section 5B(1), a judge or a candidate for election to judicial office shall not:
>
> (a)    identify themselves as members of a political organization, except as necessary to vote in an election;
>
>   . . . .
>
> (d)    attend political gatherings; or seek, accept or use endorsements from a political organization.

52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 5, subd. A(1)(a), (d). Section 5B(1)(a) provides that "[a] judge or a candidate for election to judicial office may

-8-

. . . speak to gatherings, *other than political organization gatherings*, on his or her own behalf."[2]  Id. at subd. B(1)(a) (emphasis added).  The solicitation clause states,

> A candidate shall not personally solicit or accept campaign contributions or personally solicit publicly stated support.  A candidate may, however, establish committees to conduct campaigns for the candidate through media advertisements, brochures, mailings, candidate forums and other means not prohibited by law.  Such committees may solicit and accept campaign contributions, manage the expenditure of funds for the candidate's campaign and obtain public statements of support for his or her candidacy.  Such committees are not prohibited from soliciting and accepting campaign contributions and public support from lawyers, but shall not seek, accept or use political organization endorsements. Such committees shall not disclose to the candidate the identity of campaign contributors nor shall the committee disclose to the candidate the identity of those who were solicited for contribution or stated public support and refused such solicitation.  A candidate shall not use or permit the use of campaign contributions for the private benefit of the candidate or others.

Id. at subd. B(2).[3]

_____

[2]Canon 5 defines "political organization" as "an association of individuals under whose name a candidate files for partisan office"–a political party.  Canon 5, subd. D.

[3]The dissent notes that an Advisory Committee was involved in post-White amendments to Canon 5.  Minn. Stat. § 480.052.  The Minnesota Supreme Court did make some amendments to Canon 5 to bring the provisions into line with the Supreme Court's "announce clause" ruling in White.  But it should also be noted that the Advisory Committee recommended the deletion of parts of the partisan-activities clause of Canon 5 because the Committee believed, as do we, that it is not narrowly tailored.  Several members of the Committee also noted, as do we, that the clause is impermissibly underinclusive because it applies only to political parties, and not to interest groups.  The Minnesota Supreme Court was not responsive to these recommendations, and the partisan-activities and solicitation clauses at issue here are

The facts of this case demonstrate the extent to which these provisions chill, even kill, political speech and associational rights. In his 1996 bid for a seat as an associate justice of the Minnesota Supreme Court, appellant Gregory Wersal (and others working on his behalf) identified himself as a member of the Republican Party of Minnesota, attended and spoke at the party's gatherings, sought the endorsement of the party, and personally solicited campaign contributions. In response to Wersal's appearance at and speech to a Republican Party gathering, a complaint was filed with the Minnesota Lawyers Professional Responsibility Board, alleging that Wersal's actions violated Canon 5A(1)(d). Although the Minnesota Office of Lawyers Professional Responsibility (OLPR) ultimately dismissed the complaint, the complaint accomplished its chilling effect. Wersal, fearful that other complaints might jeopardize his opportunity to practice law, withdrew from the race.

Wersal made a second bid for a seat on the Minnesota Supreme Court in 1998. In 1997 and 1998, Wersal asked the OLPR for advisory opinions regarding the solicitation and partisan-activities clauses. The OLPR's response was mixed, stating it would not issue an opinion regarding personal solicitation, in light of proposed amendments to the Canon and the fact that there were no judicial elections scheduled that particular year. It also stated that it would enforce the partisan-activities clause. Wersal then initiated this litigation. In the meantime, he was forced to write several letters to individuals who had indicated they would speak on his behalf at Republican Party conventions across the state, asking them not to do so in order to avoid violating Canon 5 and imploring them to "[p]lease be patient. I hope for a decision from the Federal Courts soon." He also had his campaign's legal counsel advise the chairman of the Republican Party of Minnesota that Canon 5 would prohibit Wersal from accepting or using any endorsement from the party. There is no question that Wersal sought to work within the confines of Canon 5 even as he sought to challenge

the same now as when this litigation was commenced.

-10-

it–confines that in the most direct of ways restricted his political speech and association, compelling him at one point to end a political campaign.

## II.     DISCUSSION

### A.     Judicial Selection in Minnesota

Minnesota has chosen to elect the judges of its courts.  Minn. Const. art. 6, § 7.  "The fundamental law of this state is, and always has been, that the selection of judges must be submitted to the electors . . . ."  State ex rel. La Jesse v. Meisinger, 103 N.W.2d 864, 866 (Minn. 1960).  Some thirty-three states employ some form of contested election for their trial courts of general jurisdiction, their appellate courts, or both.  American Judicature Society, Judicial Selection in the States: Appellate and General Jurisdiction Courts (Jan. 2004).  As federal judges, we confess some bias in favor of a system for the appointment of judges.  Indeed, there is much to be said for appointing judges instead of electing them, perhaps the chief reason being the avoidance of potential conflict between the selection process and core constitutional protections.  In promoting the newly drafted United States Constitution, Hamilton argued in Federalist No. 78 that if the people were to choose judges through either an election or a process whereby electors chosen by the people would select them, the judges would harbor "too great a disposition to consult popularity to justify a reliance that nothing would be consulted but the Constitution and the laws."  The Federalist No. 78, at 439 (Alexander Hamilton) (Clinton Rossiter ed., 1961).  Arguably, concerns about judicial independence and partisan influence, posited by Minnesota as grounds for regulating judicial election speech, are generated, fundamentally, not by the exercise of political speech or association, but by concerns surrounding the uninhibited, robust and wide-open processes often involved in the election of judges in the first place.  As Justice O'Connor noted in her White concurrence, "the very practice of electing judges undermines [an] interest" in an actual and perceived impartial judiciary.  536 U.S. at 788.

Yet, there is obvious merit in a state's deciding to elect its judges, especially those judges who serve on its appellate courts. It is a common notion that while the legislative and executive branches under our system of separated powers make and enforce public policy, it is the unique role of the judicial branch to *interpret,* and be quite apart from making that policy.

But the reality is that "[t]he policymaking nature of appellate courts is clear." Michael R. Dimino, Pay No Attention To That Man Behind the Robe: Judicial Elections, The First Amendment, and Judges as Politicians, 21 Yale L. & Pol'y Rev. 301, 364 (2003) (citing Henry R. Glick, Policy Making and State Supreme Courts, in The American Courts: A Critical Assessment 87 (John B. Gates & Charles A. Johnson eds., 1991)); Stephen J. Ware, Money, Politics and Judicial Decisions: A Case Study of Arbitration Law in Alabama, 30 Cap. U. L. Rev. 583, 594 (2002) ("[It is a] myth that courts are apolitical and do not make policy. The Legal Realists exploded that myth and showed that judges do make policy. This is especially true of judges on states' highest courts."). Courts must often fill gaps created by legislation. And in particular, by virtue of what state appellate courts are called upon to do in the scheme of state government, they find themselves as a matter of course in a position to establish policy for the state and her citizens. "At the [state] appellate level, common-law functions such as the adoption of a comparative fault standard, or the determination of a forced spousal share of intestate property distribution, require a judiciary that is sensitive to the views of state citizens." Kathryn Abrams, Relationships of Representation in Voting Rights Act Jurisprudence, 71 Tex. L. Rev. 1409, 1425 (1993). The courts' policy-making power is, of course, ever subject to the power of the legislature to enact statutes that override such policy. But that in no way diminishes the reality that courts are involved in the policy process to an extent that makes election of judges a reasonable alternative to appointment.

Without question, Minnesota may choose (and has repeatedly chosen) to elect its appellate judges. The very nature of its sovereignty within our federal system

-12-

guarantees that. "[A] crucial axiom of our [federal form of] government [is that] the States have wide authority to set up their state and local governments as they wish." McMillian v. Monroe County, Ala., 520 U.S. 781, 795 (1997). Indeed, "[t]hrough the structure of its government . . . a State defines itself as a sovereign." Gregory v. Ashcroft, 501 U.S. 452, 460 (1991). Of course, that power of state self-determination is not boundless. "[It is an] axiom that, under our federal system, the States possess sovereignty concurrent with that of the Federal Government, subject . . . to limitations imposed by the Supremacy Clause." Id. at 457. The Supremacy Clause provides that the Constitution, and laws and treaties made pursuant to it, are the supreme law of the land. U.S. Const. art. VI, cl. 2. When a state engineers its governmental structure or processes in a way that curtails liberties guaranteed by the Constitution, that presumption of state self-determination is replaced, in this case, by a careful–even critical–judicial inquiry fashioned by the particular liberty at issue. If Minnesota sees fit to elect its judges, which it does, it must do so using a process that passes constitutional muster.

## B.    The First Amendment and Political Speech

Within this context, Minnesota has enacted Canon 5 in an effort to regulate judicial elections. In White, the Court held the announce clause of Canon 5, which prohibits judicial candidates from stating their views on disputed legal issues, unconstitutional. It falls to us now to determine whether the partisan-activities and solicitation clauses of Canon 5 are acceptable under the First Amendment.

The First Amendment commands that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Freedom of association is inherently a part of those liberties protected by the First Amendment. See Buckley v. Valeo, 424 U.S. 1, 15 (1976) ("The First Amendment protects political association as well as political expression."). If it were not so, many of the Amendment's guarantees would ring hollow.

-13-

An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed . . . . Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984) (citation omitted). The due process clause of the Fourteenth Amendment makes the First Amendment applicable to the states. McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 336 n.1 (1995).

Protection of political speech is the very stuff of the First Amendment. "'[I]t can hardly be doubted that the constitutional guarantee [of the freedom of speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" Buckley, 424 U.S. at 15 (quoting Monitor Patriot Co. v. Roy, 401 U.S. 265, 272 (1971)). That is because our constitutional form of government not only was borne of the great struggle to secure such freedoms as political speech, but also because such freedom helps assure the continuance of that constitutional government. "In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." Id. at 14-15.

It cannot be disputed that Canon 5's restrictions on party identification, speech to political organizations, and solicitation of campaign funds directly limit judicial candidates' political speech. Its restrictions on attending political gatherings and seeking, accepting, or using a political organization's endorsement clearly limit a judicial candidate's right to associate with a group in the electorate that shares common political beliefs and aims.

-14-

## C.     The Strict Scrutiny Framework

Political speech–speech at the core of the First Amendment–is highly protected. Although not beyond restraint, strict scrutiny is applied to any regulation that would curtail it. McIntyre, 514 U.S. at 347. The strict scrutiny test requires the state to show that the law that burdens the protected right advances a compelling state interest and is narrowly tailored to serve that interest.[4] Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 222 (1989); United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."). Strict scrutiny is an exacting inquiry, such that "it is the rare case in which . . . a law survives strict scrutiny." Burson v. Freeman, 504 U.S. 191, 211 (1992).

---

[4]The strict scrutiny test contrasts with those inquiries used for speech not at the core of the First Amendment, "commensurate with [such speech's] subordinate position in the scale of First Amendment values," Florida Bar v. Went For It, Inc., 515 U.S. 618, 623 (1995), or for regulations which only incidentally burden speech, United States v. O'Brien, 391 U.S. 367 (1968). So-called "intermediate scrutiny" is applied to restrictions of commercial speech. See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557 (1980).

A regulation that restricts free speech only incidentally will be upheld, under the O'Brien test, if (1) it is within the constitutional power of Congress or the legislature to enact it, (2) it furthers an important or substantial governmental interest, (3) the regulation is unrelated to suppressing free expression, and (4) its restriction of speech is "no greater than is essential to the furtherance of that interest." O'Brien, 391 U.S. at 377. And some "narrowly limited classes" of speech enjoy no First Amendment protection. Chaplinsky v. New Hampshire, 315 U.S. 568, 571 (1942). "These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words . . . ." Id. at 572.

## 1.    The Requirement of a Compelling State Interest

Precisely what constitutes a "compelling interest" is not easily defined. Attempts at definition generally use alternative, equally superlative language: "interest[] of the highest order," "overriding state interest," "unusually important interest." Wisconsin v. Yoder, 406 U.S. 205, 215 (1972); McIntyre, 514 U.S. at 347 (1995); Goldman v. Weinberger, 475 U.S. 503, 530 (1986) (O'Connor, J., dissenting); see David Crump, The Narrow Tailoring Issue in the Affirmative Action Cases: Reconsidering the Supreme Court's Approval in Gratz and Grutter of Race-Based Decision-Making by Individualized Discretion, 56 Fla. L. Rev. 483, 498 (2004) ("The concept of a compelling governmental interest is deceptively self-evident. Its own words define it.  It is an interest that is compelling, or extremely important, or of the 'first order.'").   And "[n]owhere in the text of the Constitution, or in its plain implications, is there any guide for determining what is a 'legitimate' state interest, [compelling or otherwise]." Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 181 (1972) (Rehnquist, J., dissenting).  In addition, few of the Court's cases explain what makes a state interest "compelling."  But some general guides can be deduced from what the Court has said.  Some opinions have found an interest compelling based on policy grounds.[5]   Others have found a basis in "the realization of constitutional guarantees."  See Stephen E. Gottlieb, Compelling Governmental Interests: An Essential But Unanalyzed Term in Constitutional Adjudication, 68 B.U. L. Rev. 917, 932-37 (1988) (collecting cases).

---

[5]Some of those policies have included apprehending highly mobile criminal suspects, deterring murder, avoiding the harms of illicit drugs, realizing consumer benefits in licensing requirements for professionals, and upholding the administration of justice. See Stephen E. Gottlieb, Compelling Governmental Interests: An Essential But Unanalyzed Term in Constitutional Adjudication, 68 B.U. L. Rev. 917, 935 n.85 (1988) (collecting cases).

In general, strict scrutiny is best described as an end-and-means test that asks whether the state's purported interest is important enough to justify the restriction it has placed on the speech in question in pursuit of that interest. As one commentator has said, "the Court's treatment of governmental interests has become largely intuitive, a kind of 'know it when I see it' approach." Id. at 937. Such an analysis requires, first, a clear understanding of what the state's interest may be. "Clarity on this point is essential before we can decide whether [the purported interest] is indeed a compelling state interest . . . ." White, 536 U.S. at 775.

The inquiry of whether the interest (the end) is "important enough"–that is, sufficiently compelling to abridge core constitutional rights–is informed by an examination of the regulation (the means) purportedly addressing that end. A clear indicator of the degree to which an interest is "compelling" is the tightness of the fit between the regulation and the purported interest: where the regulation fails to address significant influences that impact the purported interest, it usually flushes out the fact that the interest does not rise to the level of being "compelling." If an interest is *compelling* enough to justify abridging core constitutional rights, a state will enact regulations that substantially protect that interest from similarly significant threats. As expressed in White: "'[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon . . . speech, when it leaves appreciable damage to that supposedly vital interest unprohibited.'" Id. at 780 (first alteration in original) (quoting The Florida Star v. B.J.F., 491 U.S. 524, 541-42 (1989) (Scalia, J., concurring)).[6] Accord City of Ladue v. Gilleo, 512 U.S. 43, 52-53 (1994) ("Exemptions from an otherwise legitimate regulation of a medium of speech . . . may diminish the credibility of the government's rationale for restricting speech in the first place."); Florida Star, 491 U.S. at 540 ("[T]he facial underinclusiveness

[6]The teachings of Florida Star make it clear that where a law is underinclusive to such a degree that the stated interest is not meaningfully protected, a state's claim that the interest is vital enough to abridge core constitutional rights is substantially attenuated. 491 U.S. at 541-42 (Scalia, J., concurring).

-17-

[of a speech regulation] raises serious doubts about whether [the state] is, in fact, serving . . . the significant interests [it articulates]."); Carey v. Brown, 447 U.S. 455 (1980) (finding purported interest in residential privacy not truly compelling where a picketing statute prohibited peaceful picketing in general, but not peaceful *labor* picketing, in residential neighborhoods); Young v. Am. Mini Theatres, Inc., 427 U.S. 50, 67 n.27 (1976) ("If some groups are exempted from a prohibition [purported to uphold a state interest], the rationale for regulation is fatally impeached.") (quotation omitted).

## 2. The Need for Narrow Tailoring

Once a state interest is found to be sufficiently compelling, the regulation addressing that interest must be narrowly tailored to serve that interest. Eu, 489 U.S. at 222. As with the compelling interest determination, whether or not a regulation is narrowly tailored is evidenced by factors of relatedness between the regulation and the stated governmental interest. A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative). See id. at 226, 228-29 (evaluating the degree to which the regulation in question advanced the stated interest at all); Buckley, 424 U.S. at 45-47 (same); Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 122 n.* (1991) (stating that a regulation is not narrowly tailored if it is overinclusive); Florida Star, 491 U.S. at 540 (holding that the underinclusiveness of a statute raises "serious doubts" about whether the statute actually serves the state's purported interest); Rutan v. Republican Party of Ill., 497 U.S. 62, 74 (1990) (finding that a less restrictive means was available to advance the state's interest); FEC v. Mass. Citizens for Life, Inc., 479 U.S. 238, 262 (1986) (same); Florida Star, 491 U.S. at 538 (same); Eugene Volokh, Freedom of Speech, Permissible Tailoring and

-18-

<u>Transcending Strict Scrutiny</u>, 144 U. Pa. L. Rev. 2417 (collecting cases). In short, the seriousness with which the regulation of core political speech is viewed under the First Amendment requires such regulation to be as *precisely* tailored as possible.

### D.    Minnesota's Purported Compelling State Interest

In <u>Kelly</u>, Minnesota argued that Canon 5's restrictions on judicial candidate speech served a compelling state interest in maintaining the independence, and the impartiality, of the state's judiciary. Minnesota continues to argue that judicial independence, as applied to the issues in this case, springs from the need for impartial judges. Apparently, the idea is that a judge must be independent of and free from outside influences in order to remain impartial and to be so perceived. Thus, in <u>Kelly</u>, the panel majority understood the two notions, independence and impartiality, to be interchangeable,[7] as the Supreme Court promptly noted in <u>White</u>. 536 U.S. at 775

_____

[7]In their supplemental brief to the en banc court, Appellees attempt to resurrect from earlier arguments to the court a notion of "independence," separate and distinct from "impartiality," that seeks to maintain real and apparent separation of the judiciary from political influences as a compelling state interest. The partisan-activities clause in particular, they argue, serves this interest by "ensur[ing] that the public views the judiciary as being independent of the strong political influences that pervade legislative and executive branch elections and continue to strongly influence legislative and executive branch decisions thereafter." Supplemental Br. on Remand of Defendants-Appellees at 10. This argument, however, falls prey to the same inherent underinclusiveness of Canon 5 that we discuss, <u>post</u> at 32-34, with regard to its regulation of activities that concern only political parties.

We note that Appellees fret over the kind of influence political parties have in not only elections, but also governmental decisions made thereafter. This case, however, is not about what happens after an election. And in whatever measure this concern is addressed to political parties, it must equally apply to interest groups. By way of illustration using the legislative context Appellees mention, it is likely that the AFL-CIO concerns itself just as much as do the political parties with who chairs the legislative committees dealing with labor matters. And Minnesota's bar associations

and trial lawyer associations almost certainly express as much interest as do the political parties in who leads the judiciary committees. While the record does not discuss this point, it is an unavoidable political reality. The essential point is that treating political parties differently than interest groups lies at the heart of the underinclusiveness problem in this case. Such underinclusiveness bedevils any claim that "independence" is a compelling state interest because consorting with politically active interest groups–certainly a source of equally worrisome potential for influence or the appearance of influence–is not regulated at all, as we discuss in more detail, post at 32-34. Thus, we proceed under Minnesota's original interchangeable use of "impartiality" and "independence."

The Minnesota Supreme Court's refusal to adopt the recommendations of its Advisory Committee discussed in footnote 3, ante at 9-10, seems to have prompted the dissent to advance yet another previously unrecognized and unprecedented definition of judicial independence–a separation of powers theory. The Minnesota Supreme Court said,

> [T]he separation of powers inherent in the creation of three distinct branches of government, one of which is the judicial branch, in article III, section 1 of the Minnesota Constitution provides the constitutional underpinning for the *independence* of the Minnesota judiciary. As the executive and legislative branches are inextricably intertwined with partisan politics, maintenance of an independent judicial branch is reliant on the freedom of its officials from the control of partisan politics.

In re Amendment of the Code of Judicial Conduct, No. C4-85-697, slip op. at 4 (Minn. Sept. 14, 2004) (emphasis added).

Our opinion recognizes, citing Gregory v. Ashcroft, 501 U.S. 452 (1991), the right of a state to organize its government and to provide for separation of powers in its governmental structure. Ante at 12-13. We also recognize the Supremacy Clause of the Constitution and the requirement that state action may not violate the Constitution–including the First Amendment. Id.

There are, however, at least two other basic frailties to the dissent's arguments

n.6.  In <u>Kelly</u>, the panel majority analyzed the announce, partisan-activities, and solicitation clauses in light of impartiality as a compelling interest, but failed to define "impartiality."  On appeal, the Supreme Court filled that void by fleshing out its meaning.  Justice Scalia reasoned that impartiality in the judicial context has three potential meanings.

---

regarding Minnesota's interest in any separation of powers.  First, neither the Supreme Court, nor any other court that we could find, has ever determined that a state's interest in maintaining a separation of powers is sufficiently compelling to abridge core First Amendment freedoms.  While the dissent states that a separation of powers is a basic concept in Minnesota's constitution, the right to free political speech and association guaranteed by the First Amendment to the United States Constitution is no less basic a concept.  Indeed, First Amendment rights are even more fundamental.  The right to free and open elections undergirds the framework of government established by any constitution, state or federal.  Second, nothing in our opinion or the remedies sought by Appellants serve to further blur any existing lines between the judicial, legislative and executive branches of Minnesota state government.  Rather, it is the actions of the Minnesota Supreme Court in adopting Canon 5 that have, in fact, taken the courts into what the dissent describes as the "political branches" of government and compromised any separation of powers framework established by Minnesota's constitution.

Though the Minnesota constitution allows the legislature to provide for disciplining judges, and the state legislature has given the Minnesota Supreme Court the authority to censure or remove judges and to promulgate rules of *conduct for lawyers*, through Canon 5, and without apparent constitutional or statutory authority, the Minnesota Supreme Court has stepped into the legislative arena in an attempt to regulate the political climate of statewide elections, an authority seemingly granted only to the Minnesota legislature under its plenary powers.  Minn. Const. art. 6, § 9; Minn. Stat. § 490.16; Minn. Stat. § 480.05.  See Minn. Stat. §§ 200.01 <u>et seq.</u> (Minnesota legislature's enactments regarding statewide elections).  Indeed, without any stated or readily discernible authority whatsoever, the Canon writes political parties out of statewide judicial elections and allows other political interests to fully participate in a totally unregulated manner.

-21-

One possible meaning of "impartiality" is a "lack of preconception in favor of or against a particular *legal view*." Id. at 777. Quickly discounting this uncommon use of the word, the Court said it could not be a compelling interest for a judge to "lack . . . predisposition regarding the relevant legal issues in a case" because such a requirement "has never been thought a necessary component of equal justice." Id. The Court reasoned, first, that it is "virtually impossible" to find a judge who lacks any "preconceptions about the law," and second, that it would not be desirable to have such a judge on the bench. Id. "Proof that a Justice's mind at the time he joined the Court was a complete *tabula rasa* in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias." Id. at 778 (quotation omitted). We follow the Court's direction and likewise dismiss the idea that this meaning of impartiality could be a compelling state interest.

A second possible meaning is a "lack of bias for or against either *party* to [a] proceeding." Id. at 775. Calling this the traditional understanding of "impartiality" and the meaning used by Minnesota and amici in their due process arguments, the Court explained that this notion "guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party." Id. at 776. The Court implied, and we find it to be substantially evident, that *this* meaning of impartiality describes a state interest that is compelling. It can hardly be argued that seeking to uphold a constitutional protection, such as due process, is not per se a compelling state interest. See, e.g., Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 311-315 (1978) (recognizing the First Amendment as a basis for a compelling state interest). And the rule laid down in Tumey v. Ohio, 273 U.S. 510 (1927), makes clear that the partiality of a judge as it relates to a party to a case violates due process protections: "[I]t certainly violates the Fourteenth Amendment, and deprives [a person] of due process of law, to subject his liberty or property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case." Id. at 523. In Bracy v. Gramley, 520 U.S. 899 (1997), the Court reiterated that "the floor established by the Due Process

-22-

Clause clearly requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case." Id. at 904-05 (quotation and citation omitted).   See also Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 821-25 (1986) (citing Tumey); Ward v. Monroeville, 409 U.S. 57, 58-62 (1972) (same); Johnson v. Mississippi, 403 U.S. 212, 215-16 (1971) (per curiam) (holding that due process was violated where a judge presided in a case involving a party who had successfully sued him earlier. "Trial before 'an unbiased judge' is essential to due process."); In re Murchison, 349 U.S. 133, 137-39 (1955) (holding that due process was violated by a judge presiding over both the indictment, under a special "judge-grand jury" procedure in Michigan, and trial of a criminal defendant).

Being convinced that protecting litigants from biased judges is a compelling state interest, we turn to the "narrow tailoring" examination of the partisan-activities clause under this particular meaning of judicial impartiality.  Because this meaning directs our attention to parties to the litigation rather than to ideas and issues, we analyze the regulation in this context before turning to other possible definitions of impartiality.  We consider whether the partisan-activities clause actually addresses this compelling state interest and, if so, whether it is the least restrictive means of doing so.

In White, the Supreme Court found that the announce clause failed the narrow tailoring aspect of the strict scrutiny test, holding "[i]ndeed, the clause is barely tailored to serve that [lack of bias] interest *at all*, inasmuch as it does not restrict speech for or against particular *parties*, but rather speech for or against particular *issues*." White, 536 U.S. at 776.  Thus, the Court found that clause was not narrowly tailored because it failed to advance a compelling interest.  The same is true for the partisan-activities clause.

## 1. Unbiased Judges and the Narrow Tailoring of the Partisan-Activities Clause

In one sense, the underlying rationale for the partisan-activities clause–that *associating with a particular group* will destroy a judge's impartiality–differs only in form from that which purportedly supports the announce clause–that *expressing one's self on particular issues* will destroy a judge's impartiality. Canon 5, in relevant part, forbids a judicial candidate from identifying with a political organization, making speeches to a political organization, or accepting endorsements from or even attending meetings of a political organization, all of which are the quintessence of political associational activity. And beyond its importance in bringing about those rights textually protected by the First Amendment, association, as earlier noted, is itself an important form of speech, particularly in the political arena. See, e.g., Boy Scouts of Am. v. Dale, 530 U.S. 640, 655-56 (2000) (holding that the Boy Scouts had a First Amendment right to send a particular message based on the individuals it allowed to be associated with the organization as scoutmasters); Eu, 489 U.S. at 223 ("[T]he First Amendment has its fullest and most urgent application to speech . . . during a campaign for political office.") (quotation omitted). Indeed, Minnesota argues that a party label is nothing more than shorthand for the views a judicial candidate holds. Br. of Appellee The Hon. Charles Flinn, Jr. at 30. Inasmuch, then, as the partisan-activities clause seeks, at least in part, to keep judges from aligning with particular views on issues by keeping them from aligning with a particular political party, the clause is likewise "barely tailored" to affect any interest in impartiality toward parties. Thus, the Supreme Court's analysis of the announce clause under this meaning of "impartiality," to wit judicial bias, is squarely applicable to the partisan-activities clause.

> To be sure, when a case arises that turns on a legal issue on which the judge (as a candidate) had taken a particular stand, [be that through *announcing* or *aligning with* particular views,] the party taking the opposite stand is likely to lose. But not because of any bias against that

party, or favoritism toward the other party. *Any* party taking that position is just as likely to lose. The judge is applying the law (as he sees it) evenhandedly.

White, 536 U.S. at 776-77.

We recognize that the difference between the direct expression of views under the announce clause and expressing a viewpoint under the partisan-activities clause through association, is that the latter requires the aligning of one's self with other like-minded individuals–that is, the members of a political party.

Political parties are, of course, potential litigants, as they are in this case. Thus, in a case where a political party comes before a judge who has substantially associated himself or herself with that same party, a question could conceivably arise about the potential for bias in favor of that litigant. Yet even then, any credible claim of bias would have to flow from something more than the bare fact that the judge had associated with that political party. That is because the associational activities restricted by Canon 5 are, as we have pointed out, part-and-parcel of a candidate's speech for or against particular *issues* embraced by the political party. And such restrictions, we have also said, do not serve the due process rights of *parties*. In the case of a political party involved in a redistricting dispute, for example, the fact that the matter comes before a judge who is associated with the Republican or Democratic Party would not implicate concerns of bias for or against that party unless the judge were in some way involved in the case beyond simply having an "R" or "D," or "DFL" (denoting Minnesota's Democratic-Farmer-Labor Party) after his or her name. See Minn. State Bar Ass'n v. Divorce Educ. Assocs., 219 N.W.2d 920, 922 (Minn. 1974) (holding that in civil action brought by state bar association seeking injunction against individuals for unauthorized practice of law, membership in the same bar association would not in itself disqualify a judge from hearing the case on a theory the judge was "impliedly biased"). Thus, the partisan-activities clause does not

advance an interest in impartiality toward litigants in a case where, without more, it is a like-minded political party which is one of the litigants.

And in those political cases where a judge is more personally involved, such as where the redistricting case is a dispute about how to draw that judge's district, and even in those cases discussed above that merely involve a political party as a litigant, recusal is the least restrictive means of accomplishing the state's interest in impartiality articulated as a lack of bias for or against parties to the case. Through recusal, the same concerns of bias or the appearance of bias that Minnesota seeks to alleviate through the partisan-activities clause are thoroughly addressed without "burn[ing] the house to roast the pig." Butler v. Michigan, 352 U.S. 380, 383 (1957). Indeed, Canon 3 of the Minnesota Code of Judicial Conduct provides that a judge is to "disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 3, subd. D(1). Section (a) of the statute in particular addresses Minnesota's goals, providing that a judge should recuse himself where "the judge has a personal bias or prejudice concerning a party." Concern about the mere *appearance* of bias is also addressed by recusal. See In re Collection of Delinquent Real Prop. Taxes, 530 N.W.2d 200, 206 (Minn. 1995) (holding that "[t]he controlling principle is that no judge . . . ought ever to [hear] the cause of any citizen, *even though he be entirely free from bias in fact*, if circumstances have arisen which give a bona fide appearance of bias to litigants.").

Therefore, the partisan-activities clause is barely tailored at all to serve any interest in unbiased judges, and, at least, is not the least-restrictive means of doing so. Accordingly, it is not narrowly tailored to any such interest and fails under strict scrutiny.

### 2. Impartiality Understood as "Openmindedness," and the Partisan-Activities Clause

The third possible meaning of "impartiality" articulated by the Supreme Court in White, and the one around which its analysis of the announce clause revolved, was "described as openmindedness." White, 536 U.S. at 778. The Court explained,

> This quality in a judge demands, not that he have no preconceptions on legal issues, but that he be willing to consider views that oppose his preconceptions, and remain open to persuasion, when the issues arise in a pending case. This sort of impartiality seeks to guarantee each litigant, not an *equal* chance to win the legal points in the case, but at least *some* chance of doing so.

Id. The Court stopped short, however, of determining whether impartiality articulated as "openmindedness" was a compelling state interest because it found that, even if it were, the "woeful[] underinclusive[ness]" of the clause betrayed any intended purpose of upholding openmindedness. Id. at 780.

We conclude that the partisan-activities clause is likewise "woefully underinclusive," calling into question its validity in at least two ways. First, it leads us to conclude, before even reaching a compelling interest inquiry, that like the announce clause, the partisan-activities clause was not adopted for the purpose of protecting judicial openmindedness. Second, under a compelling interest analysis, the clause's underinclusiveness causes us to doubt that the interest it purportedly serves is sufficiently compelling to abridge core First Amendment rights. We conclude that the underinclusiveness of the partisan-activities clause causes it to fail strict scrutiny.[8]

---

[8]The dissent expands the Supreme Court's articulation of judicial "openmindedness" in White by importing an "anti-corruption" element from Buckley v. Valeo, 424 U.S. 1 (1976), post at 49-50. But, Buckley is a case involving the

regulation of the size, source and use of political contributions. It does not deal with the direct suppression of core political speech and association at issue in this case. And, there is nothing in the record that supports the interposition of the anti-corruption concerns advanced by the dissent.

The dissent also seeks to insert anti-corruption arguments discussed in McConnell v. FEC, 540 U.S. 93 (2003), yet another political contributions case, into the candidate speech and association issues before us today. However, the Supreme Court, in McConnell, did not once cite White in the entirety of its 251-page opinion dealing with the corrupting influence of "soft" money and the political communications such money can buy. In addressing the legislation at issue in McConnell, the Supreme Court noted that the Bipartisan Campaign Reform Act of 2002 "regulates the use of soft money [as defined in the opinion] by political parties, office holders, and candidates." 540 U.S. at 132. The Court further states that the Act, "primarily prohibits corporations and labor unions from using general treasury funds for communications that are intended to, or have the effect of, influencing the outcome of federal elections." Id. Neither Buckley nor McConnell is a strict scrutiny case, though the dissent acknowledges that strict scrutiny applies in this case. See post at 73 n.22. As stated in McConnell, "'there is no place [in this "soft money" case] for a strong presumption against constitutionality, of the sort often thought to accompany the words "strict scrutiny."'" 540 U.S. at 137 (quoting Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 400 (2000)). In keeping with this, the Court applied a "less rigorous [than strict scrutiny] standard of review." Id. And McConnell's one paragraph review of an underinclusiveness argument did not lay out any rule applicable to this case. The Court in White gave us the rule: "'[A] law cannot be regarded as protecting an interest of the *highest order*, and thus as justifying a restriction upon . . . speech, when it leaves appreciable damage to that *supposedly vital interest* unprohibited.'" 536 U.S. at 780 (emphasis added) (first alteration in original) (quoting Florida Star, 491 U.S. at 541-42 (Scalia, J., concurring)). In Buckley, the Court explained the use of two differing standards of review to governmentally imposed restrictions on election-related activities. The Court analyzed campaign contributions, and their reasonable limitations, under a "sufficiently important interest" standard that asked whether the limitations were "closely drawn to avoid unnecessary abridgement of [political] freedoms." 424 U.S. at 25. And where the Court actually discussed rights similar to those at issue in this case, it imposed "exacting scrutiny applicable to limitations on core First Amendment

### a. Underinclusiveness Belies Purported Purpose

Underinclusiveness in a regulation may reveal that motives entirely inconsistent with the stated interest actually lie behind its enactment.  See id. at 779 (noting that the underinclusiveness of the announce clause "is quite incompatible with the notion that the need for openmindedness . . . lies behind the prohibition at issue here"); City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493 (1989) (stating, in an equal protection case, "[i]ndeed, the purpose of strict scrutiny is to 'smoke out' illegitimate [purposes] . . . .  The test also ensures that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was [something inconsistent with the interest]."); City of Cleburne v.

---

rights of political expression."  Id. at 44-45.  In fact, the Court stated clearly what we must keep in mind today:

> [A] candidate, no less than any other person, has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates.  Indeed, it is of particular importance that candidates have the unfettered opportunity to make their views known [and associate with like-minded persons] so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day.  Mr. Justice Brandeis' observation that in our country public discussion is a political duty, applies with special force to candidates for public office. . . .  [T]he First Amendment simply cannot tolerate [a] restriction upon the freedom of a candidate to speak [or associate] without legislative limit on behalf of his own candidacy.

Id. at 52-54 (quotation omitted).

In sum, Buckley and McConnell do not support an underinclusive or incremented approach to "strict scrutiny" analysis and the teachings of these cases do not support the dissent's position to the contrary.

Cleburne Living Ctr., 473 U.S. 432 (1985) (finding that the underinclusiveness of a zoning regulation betrayed the city's purported interests in, inter alia, not locating housing in a flood plain, not being legally responsible for the actions of its occupants, assuring adequate square footage per occupant, and lessening residential and street congestion); First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 793 (1978) (finding that the underinclusiveness of a regulation "undermines the likelihood of a genuine state interest" in the purported goal). In White, the Court found that, "as a means of pursuing the objective of openmindedness . . . the announce clause is so woefully underinclusive as to render belief in that purpose a challenge to the credulous." White, 536 U.S. at 780. The underinclusiveness manifests itself in the inherently brief period of speech regulation during a political campaign relative to the many other instances in which a judicial candidate, especially an incumbent who is a candidate, has an opportunity to speak on disputed issues. The Court reasoned that if the purpose of the announce clause were truly to assure the openmindedness of judges, Minnesota would not try to address it through a regulation that restricted speech only during a campaign since candidates' views on contentious legal issues can be and are aired in the many speeches, class lectures, articles, books, or even court opinions given or authored before, during or after any campaign.

The same is true of the partisan-activities clause. The announce clause bars a judicial candidate from stating his views on disputed issues though "he may say the very same thing . . . up until the very day before he declares himself a candidate." Id. at 779. The partisan-activities clause bars a judicial candidate from associative activities with a political party during a campaign, though he may have been a life-long, active member of a political party (even accepting partisan endorsements for nonjudicial offices) up until the day he begins his run for a judicial seat. A regulation requiring a candidate to sweep under the rug his overt association with a political party for a few months during a judicial campaign, after a lifetime of commitment to that party, is similarly underinclusive in the purported pursuit of an interest in judicial openmindedness. The few months a candidate is ostensibly purged of his

-30-

association with a political party can hardly be expected to suddenly open the mind of a candidate who has engaged in years of prior political activity. And, history indicates it will be rare that a judicial candidate for a seat on the Minnesota Supreme Court will not have had some prior, substantive, political association. In sum, restricting association with a political party only during a judicial campaign, in supposed pursuit of judicial openmindedness, renders the partisan-activities clause "so woefully underinclusive as to render belief in that purpose a challenge to the credulous." Id. at 780.

As for the appearance of impartiality, the partisan-activities clause seems even less tailored than the announce clause to an interest in openmindedness. While partisan activity may be an indirect indicator of potential views on issues, an affirmative enunciation of views during an election campaign more directly communicates a candidate's beliefs. If, as the Supreme Court has declared, a candidate may *speak* about her views on disputed issues, what appearance of "impartiality" is protected by keeping a candidate from simply *associating* with a party that espouses the same or similar positions on the subjects about which she has spoken? Moreover, even if there were some system in which it would make sense to allow one but not the other in pursuit of the same goal, cabining a candidate from a political party for the relatively short duration of a campaign would add nothing to an appearance of impartiality. Given this "woeful underinclusiveness" of the partisan-activities clause, it is apparent that advancing judicial openmindedness is not the purpose that "lies behind the prohibition at issue here."[9] Id. at 779.

---

[9]Rather, the fruits of Canon 5 appear to bear witness to its remarkably pro-incumbent character.

In 2004, of the three Minnesota Supreme Court seats up for election, only one was contested. (Originally, two seats were contested, but a challenger was disqualified.) Minnesota Lawyer, Judicial Elections 2004 (2004), at http://www.minnlawyer.com/elections/2004/uncontested.cfm (last visited Feb. 10, 2005). In the race that was contested, the incumbent enjoyed a nearly thirty-two

## b. Underinclusiveness Betrays "Compelling" Claim

While it is not necessary for us to reach the question of whether judicial openmindedness as defined in <u>White</u> is sufficiently compelling to abridge core First Amendment rights, we note that the underinclusiveness of Canon 5's partisan activities clause clearly establishes that the answer would be no. Whether Minnesota asserts a compelling state interest in judicial openmindedness is substantially informed by the fit between the partisan-activities clause and the purported interest at stake. A clear indicator of the compelling nature of an interest is whether the state has bothered to enact a regulation that guards the interest from all significant threats.

---

percent margin in contributions from outside, non-loan sources. Candidate Filings, Minnesota Campaign Finance and Public Disclosure Board (2004). The data from the Minnesota Court of Appeals is even more striking. Of the five Court of Appeals seats up for election, only two were contested. Minnesota Lawyer, Judicial Elections 2004 (2004), at http://www.minnlawyer.com/elections/2004/uncontested.cfm (last visited Feb. 10, 2005). In those two races, the incumbents were able to collect a combined total of $104,172.21 in contributions against a combined challengers' total of just $4,546.46–nearly twenty-three times as much. Candidate Filings, Minnesota Campaign Finance and Public Disclosure Board (2004).

In 2000, Supreme Court incumbents raised a combined $505,120.66. Candidate Filings, Minnesota Campaign Finance and Public Disclosure Board (2000). Only two of the challengers raised enough money to trigger disclosure. Their combined total was $23,582.67. <u>Id.</u>

Notably, donations from lawyers and law firm-related political funds account for a substantial portion of incumbents' re-election war chests. In one 2004 Court of Appeals race, such contributions accounted for over forty-three percent of the incumbent's total campaign funds. Candidate Filings, Minnesota Campaign Finance and Public Disclosure Board (2004). In the 2004 Supreme Court race, they made up over half of the incumbent's funds. <u>Id.</u>

We are guided on remand by the law enunciated in White, and the Court's words bear repeating: "[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." Id. at 780 (quotation omitted). By its own terms, Canon 5's restrictions on association with "political organizations" apply only to "association[s] of individuals under whose name a candidate files for partisan office"–political parties. 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 5, subd. D. Yet, if mere association with an organization whose purpose is to advance political and social goals gives Minnesota sufficient grounds to restrict judicial candidates' activities, it makes little sense for the state to restrict such activity only with political parties. There are numerous other organizations whose purpose is to work at advancing any number of similar goals, often in a more determined way than a political party. Minnesota worries that a judicial candidate's consorting with a political party will damage that individual's impartiality or appearance of impartiality as a judge, apparently because she is seen as aligning herself with that party's policies or procedural goals. But that would be no less so when a judge as a judicial candidate aligns herself with the constitutional, legislative, public policy and procedural beliefs of organizations such as the National Rifle Association (NRA), the National Organization for Women (NOW), the Christian Coalition, the NAACP, the AFL-CIO, or any number of other political interest groups. While Minnesota expresses doubt that the influence an interest group can have over a candidate is comparable to that of a political party, the record in this case refutes the premise.[10] Indeed, associating with an interest group, which by

_____

[10]The record informs us of activity on the part of the League of Women Voters to publish a voter's guide regarding candidates and their views; the Minnesota Family Council urging Minnesotans to join the fight to defend traditional Judeo-Christian values; Lavender Magazine, which describes its readership as including the politically active gay-lesbian-bisexual-transgender community, providing a voter's guide; the Minnesota Women Lawyers, whose mission is to pursue equal participation for women in the legal profession, seeking to endorse judicial candidates for office; People for Responsible Government, a group interested in the accountability of

design is usually more narrowly focused on particular issues, conveys a much stronger message of alignment with particular political views and outcomes. A judicial candidate's stand, for example, on the importance of the right to keep and bear arms may not be obvious from her choice of political party. But, there can be little doubt about her views if she is a member of or endorsed by the NRA. Yet Canon 5 is completely devoid of any restriction on a judicial candidate attending or speaking to a gathering of an interest group; identifying herself as a member of an interest group; or seeking, accepting, or using an endorsement from an interest group. As a result, the partisan-activities clause unavoidably leaves appreciable damage to the supposedly vital interest of judicial openmindedness unprohibited, and thus Minnesota's argument that it protects an interest of the highest order fails.[11]

---

government to the people, holding a forum on judicial reform issues; and the state and local bar associations.

[11]The dissent appears to assert a newly minted state interest described as "protecting the judicial process from extraneous coercion." Post at 46. Although the dissent claims that such interest "has been recognized as compelling," id., it cites no precedent for the proposition and we have found none. Neither does the dissent flesh out the nature and source of this purported "coercion." While it argues that political parties are the source of such coercion, we find no evidence in the record to support that. And the dissent does not include political interest groups in its concern about coercion, notwithstanding such groups' many well documented forays into judicial selection matters.

While the dissent is concerned about political party involvement in judicial selection, state law itself inculcates partisan interests into the process. For example, when a justice of the Minnesota Supreme Court resigns shortly before the end of a term of office, a practice widely followed in Minnesota for many years, the governor, who is selected on a partisan ballot and is usually considered the current head of his or her party, selects and appoints a successor who is almost always a member of the governor's own party. Minn. Const. art. 6, § 8. Published history shows that these patronage-propounded selectees are often, if not always, former partisan office holders or party activists. The political appointee then serves a term that lasts until the next general election occurring more than one year after the appointment. Id.

-34-

### c. Underinclusiveness Not Indicative of a Legitimate Policy Choice

The panel majority in <u>Kelly</u> did not find the underinclusiveness of the partisan-activities clause troublesome. It viewed it as a legitimate policy choice: "when underinclusiveness results from a choice to address a greater threat before a lesser, it does not run afoul of the First Amendment." <u>Kelly</u>, 247 F.3d at 872. Association with political parties, goes the argument, is a greater threat to judicial openmindedness than association with interest groups because political parties have more power "to hold a candidate in thrall."[12] <u>Id.</u> at 876. But to determine whether

_____

Through this device, the gubernatorial designee is able to stand for election on the non-partisan judicial ballot ostensibly as an incumbent office holder, fully protected by Canon 5 from the rigors of a constitutionally sound political exercise. Indeed, all but one of the present members of the high court and twenty-three of the last twenty-five Supreme Court Justices ascended to the Minnesota bench in this manner. Minnesota State Law Library Docket Series: Chronological List of Justices and Judges of the Minnesota Appellate Courts (2005), at http://www.lawlibrary.state.mn.us/judges.html (last visited June 6, 2005). This partisan involvement in judicial selection, fully sanctioned by the Minnesota constitution, is direct and personal and filtered not at all by the ballot box.

[12]The panel majority in <u>Kelly</u> reasoned that treating political parties differently from interest groups is further justified given political parties' "powerful machinery," including a large membership, to enforce adherence to their views. 247 F.3d at 876. The majority also concluded different treatment was called for "because political parties have comprehensive platforms," and thus "obligation to a party has a great likelihood of compromising a judge's independence on a wide array of issues." <u>Id.</u> Yet, this does not account for the regulation of those Minnesota political parties that have a more limited membership, or that limit their focus to only a few issues, including the Constitution Party, the Natural Law Party, and the Green Party. Canon 5's oversight of these parties calls into question the asserted "powerful machinery" and "comprehensive platform" rationales for regulating political parties but not interest groups, and exposes the fact that, arbitrarily, it is the mere designation of a group as a "political party" that invokes Canon 5's regulation.

Minnesota has shown that association with political parties poses a greater menace to judicial openmindedness than association with other political interest groups, it is necessary to do at least some analysis of the two supposed threats. While the opinion in Kelly purports to examine the "threat" posed by political parties, it contains no discussion of any comparable danger advanced by association with special interest groups, despite ample record evidence that suggests the influence of these special groups is at least as great as any posed by political parties.[13]

---

[13]For instance, in testimony before the Minnesota Supreme Court in 1997 regarding proposed amendments to Canon 5, the Honorable Gary J. Meyer, Chief Judge of Minnesota's Tenth Judicial District, testified that his assignment area passed a resolution supporting amending section 5D–the definition of "political organization"– to "include not just political parties but all organizations, . . . though not individuals, which endorse candidates for elected office." Hearing on the Amendment to Canon 5 of the Code of Judicial Conduct, C7-81-300, Tr. at 36 (Minn. Nov. 19, 1997). Judge Meyer pointed out that, regarding Minnesota's purported concern about keeping partisanship out of judicial campaigns, "you do not take partisan politics out of a judicial election simply by excluding support from political parties." Id. His testimony highlighted the same concerns we raise here today:

> The definition of political organization in Paragraph D effectively . . . limits the term [to] "political parties." It [thereby] allows a candidate for the judiciary to seek and use the endorsements of such special interest groups as the National Rifle Association, the Minnesota Citizens Concerned for Life, the National Organization for Women, Mothers Against Drunk Drivers, or any labor union. Clearly, organizations such as these can and frequently do support and oppose candidates for political office. . . . It appears that the proposed changes to Canon 5 are an attempt to strip political affiliation from judicial elections, but at the same time, they allow and perhaps encourage candidates to adopt issue group affiliation. This doesn't take party politics out of the judicial election. . . . [I]f you're going to exclude one, why not exclude them all? It seems to me that it doesn't make a . . . judicial election any less political. . . . I question why it's appropriate to deny a judge the ability to have literature distributed with his or her political party while at the same time allow an opponent to seek MCCL [Minnesota Citizens

-36-

Minnesota has simply not met its heavy burden of showing that association with a political party is so much greater a threat than similar association with interest groups, at least with evidence sufficient for the drawing of a constitutionally valid line between them. As a result, cases granting some degree of deference to legislatures who seek to attack one form of a problem before addressing another form are not applicable here. See Erznoznik v. City of Jacksonville, 422 U.S. 205 (1975) (relying on Williamson v. Lee Optical Co., 348 U.S. 483 (1955)).

To the contrary "the notion that a regulation of speech may be impermissibly *underinclusive* is firmly grounded in basic First Amendment principles." Ladue, 512 U.S. at 51. While the Court in Erznoznik stated in dictum that underinclusive classifications may be upheld, "on the sound theory that a legislature may deal with one part of a problem without addressing all of it," it was quick to add that "[t]his presumption of statutory validity, however, . . . has less force when a classification turns on the subject matter of expression." Erznoznik, 422 U.S. at 215. Just as the Court did in Erznoznik, we reject the argument that the underinclusive regulation is valid. "'[A]bove all else, the First Amendment means that government has no power

Concerned for Life] support and distribution of their literature endorsing the opponent in church parking lots on the Sunday before the election. Is it fair for a judge who supported a no guns peace policy within his or her political party to not be able to seek the help of that party against an opponent who seeks and uses the NRA mailing list for an endorsement? Why should a judicial candidate be able to solicit labor union support and eventually its sample ballot, but not . . . the support of the political party for which he or she worked for many years? Is it appropriate for a judicial candidate to speak and appear at a MADD, Mothers Against Drunk Drivers, function but not [at] a political party [function]? Why should these special interest endorsements and activity be protected as constitutionally guaranteed free speech and assembly but political party endorsements and activity not be so protected[?]

Id. at 36-38, 40-41.

to restrict expression because of its message, its ideas, its subject matter, or its content.'" Id. (quoting Police Dep't of Chicago v. Mosley, 408 U.S. 92, 95 (1972)). As we have noted, political association is speech in and of itself. It allows a person to convey a message about some of his or her basic beliefs through such associations. See, e.g., Boy Scouts of Am., 530 U.S. at 655-56. Even if we were to believe that the partisan-activities clause regulates political parties and not interest groups because political parties somehow pose a greater "threat" by having a louder and more comprehensive voice, such a distinction would still turn, at least in part, on the content of the message each seeks to convey. Under such a rationale, it is the subject matter of the messages that is at stake–with political parties usually, but not always, emitting a variety of propositions and interest groups often advancing a more narrowly focused agenda. Such line-drawing based on the subject matter of expression is what the Court in Erznoznik considered suspect. Erznoznik, particularly, discredits any argument that the Minnesota Supreme Court is justified in dealing with one part of the perceived subject matter problem, and not all of it.

In Kelly, the majority relied upon Lee Optical for the proposition that a legislature "may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." 348 U.S. at 489. But Lee Optical turned on a determination that the "Equal Protection Clause goes no further than [prohibiting] invidious discrimination." Id. Thus, Lee Optical's underinclusiveness dealt with a matter of degree in a regulation that did not invoke strict scrutiny because the regulation did not implicate a fundamental right or a suspect classification. But underinclusiveness in this free speech case questions the very premise that Minnesota is seeking to address a compelling interest. Quite apart from addressing itself to any "phase" of a particular problem, Minnesota seeks to regulate different sources of the same so-called "problem" based exclusively on whether or not groups are registered as Minnesota political parties. In Burson, the Court held that Tennessee's failure to restrict charitable and commercial solicitation or exit polling, in addition to campaigning, within 100 feet of polling places did not render the statute "fatally

-38-

underinclusive" because the evidence in the case did not show that such charitable and commercial solicitation influenced the state's interest of preventing fraud at polling places. 504 U.S. at 207. In stating that "[s]tates adopt laws to address the problems that confront them" and "[t]he First Amendment does not require States to regulate for problems that do not exist," the Court concluded that there was "simply no evidence that political candidates have used other forms of solicitation or exit polling to commit . . . electoral abuses." Id. By contrast, as discussed above, the evidence in this case, and common sense, show that association with political interest groups poses the same threat, if any real threat actually exists at all, to judicial openmindedness as that posed by political parties. This, coupled with the Court's view in White that "[a] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited," compels us to find that the underinclusiveness of the partisan-activities clause is not indicative of a legitimate policy choice on the part of Minnesota. White, 536 U.S. at 780 (quotation omitted).[14]

---

[14]We also do not "doom," by setting the bar too high, all future attempts by Minnesota to adopt judicial election regulations that will pass strict scrutiny. Post at 79. The dissent says that we should apply strict scrutiny with deference to states that choose to address only some threats, and that if we do not, we "occupy the enviable position of not being required to say in advance what line would be permissible," but can simply veto every attempt made at regulation. We respectfully believe this incorrectly characterizes our position and suggests a course of action that no Article III court ought to entertain.

First, we approach this case with the posture the Supreme Court has long prescribed for this inquiry: "it is the rare case in which . . . a law survives strict scrutiny." Burson, 504 U.S. at 211. A law subject to strict scrutiny because it regulates speech based on its content is *presumptively invalid*. Ashcroft v. ACLU, 124 S. Ct. 2783, 2788 (2004). And we do not carte-blanche veto Minnesota's regulations. The court's opinion today meticulously analyzes, in light of White, the relevant portions of the partisan-activities and solicitation clauses, as strict scrutiny demands.

### 3.    The Solicitation Clause

We now turn to an analysis of portions of the solicitation clause. The solicitation clause bars judicial candidates from personally soliciting individuals or even large gatherings for campaign contributions. "In effect, candidates are completely chilled from speaking to potential contributors and endorsers about their potential contributions and endorsements." Weaver v. Bonner, 309 F.3d 1312, 1322 (11th Cir. 2002). And as the majority conceded in Kelly, such restriction depends wholly upon the subject matter of the speech for its invocation. 247 F.3d at 863. Judicial candidates are not barred from personally requesting funds for any purpose other than when it is "related to a political campaign." Burson, 504 U.S. at 197. Restricting speech based on its subject matter triggers the same strict scrutiny as does restricting core political speech. "'The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire [subject].'" Carey, 447 U.S. at 462, n.6 (quoting Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n, 447 U.S. 530, 537 (1980)).

------

Second, we deal, as we should, only with the regulations presented to us today to determine whether the lines drawn by them pass the rigors of strict scrutiny. In making this determination, we cannot overlook the fact that Minnesota unevenly regulates various political groups that have the potential for the same electoral impact that the state cites as justification for its regulations. In carefully applying Supreme Court precedent, we are not in any way exercising a "veto." We simply apply strict scrutiny as required.

Finally, we would flirt with rendering an advisory opinion, or stepping into the legislative arena ourselves, were we to tell Minnesota how to structure its election laws. If the state is unable to strike a balance with its regulations that satisfies strict scrutiny, that does not indicate a failing of the inquiry; rather, it quite likely indicates that the state has impermissibly trod where it may not.

Moreover, the very nature of the speech that the solicitation clause affects invokes strict scrutiny. This is because the clause applies to requests for funds to be used in promoting a political message. It bears repeating that "'[i]t can hardly be doubted that the constitutional guarantee [of the freedom of speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" Buckley, 424 U.S. at 15 (quoting Monitor Patriot Co. v. Roy, 401 U.S. 265, 272 (1971)). And promoting a political message requires the expenditure of funds.

> [V]irtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event. The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech.

Id. at 19. As Justice O'Connor stated in her White concurrence, "[u]nless the pool of judicial candidates is limited to those wealthy enough to independently fund their campaigns, a limitation unrelated to judicial skill, the cost of campaigning requires judicial candidates to engage in fundraising." 536 U.S. at 789-90 (O'Connor, J., concurring). Insofar as the solicitation clause restricts the amount of funds a judicial candidate is able to expend on his or her political message, the regulation is of the same caliber as that struck down in Buckley.

Since strict scrutiny is clearly invoked, the solicitation clause must also be narrowly tailored to serve a compelling state interest. Minnesota asserts that keeping judicial candidates from personally soliciting campaign funds serves its interest in an impartial judiciary by preventing any undue influence flowing from financial support. We must determine whether the regulation actually advances an interest in non-biased

or openminded judges.[15]  Appellants challenge only the fact that they cannot solicit contributions from large groups and cannot, through their campaign committees, transmit solicitation messages above their personal signatures.  They do not challenge the campaign committee system that Canon 5 provides under which candidates may establish committees that may solicit campaign funds on behalf of the candidate.  "Such committees shall not disclose to the candidate the identity of campaign contributors nor shall the committee disclose to the candidate the identity of those who were solicited for contribution or stated public support and refused such solicitation."  52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 5, subd. B(2).

### a.  Unbiased Judges and the Narrow Tailoring of the Solicitation Clause

We first consider whether the solicitation clause serves an interest in impartiality articulated as a lack of bias for or against a party to a case.  Keeping candidates, who may be elected judges, from directly soliciting money from individuals who may come before them certainly addresses a compelling state interest

---

[15]The dissent cites polls from other states that show concern on the part of those surveyed that lawyers' and plaintiffs' campaign contributions to judicial candidates influence the decisions of judges.  Post at 59.  The dissent asserts that political parties embody similar threats of "outside influence" on the judiciary.  But these poll numbers provide clear evidence that the perception of influence is of a far different kind, one that is not regulated by Canon 5.

While Canon 5 severs judicial candidates from like-minded voters during an election, it expressly allows lawyers, law firms and other interest groups to donate money to their campaigns.  In the 2004 Minnesota Supreme Court election, approximately thirty-two percent of all campaign contributions came from law firm political funds and lawyers.  Candidate Filings, Minnesota Campaign Finance and Public Disclosure Board (2004).  And in the only contested race, over ninety-seven percent of such contributions went to the incumbent.  Id.  We need not speculate about the impact these lawyer contributions have on the appearance of the judiciary's integrity–the poll numbers noted by the dissent leave little question.

in impartiality as to parties to a particular case. It seems unlikely, however, that a judicial candidate, if elected, would be a "judge [who] has a direct, personal, substantial, pecuniary interest in reaching a conclusion [for or] against [a litigant in a case]," Tumey, 273 U.S. at 523, based on whether that litigant had contributed to the judge's campaign. That is because Canon 5 provides specifically that all contributions are to be made to the candidate's *committee*, and the committee "shall not" disclose to the candidate those who either contributed or rebuffed a solicitation. 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 5, subd. B(2). Thus, just as was true with the announce clause and its fit with an interest in unbiased judges, the contested portions of the solicitation clause are barely tailored at all to serve that end. An actual or mechanical reproduction of a candidate's signature on a contribution letter will not magically endow him or her with a power to divine, first, to whom that letter was sent, and second, whether that person contributed to the campaign or balked at the request.[16] In the same vein, a candidate would be even less able to trace

_____

[16]While it is argued that the addition of a candidate's personal signature increases the chances that a candidate will discover the source of contributions because some contributors will send donations directly to the candidate, such a contention is pure conjecture. Though the candidate's personal signature may appear at the foot of the letter, certainly the address included in the letter to which donations are to be sent will be that of the candidate's campaign committee, if Canon 5 is followed. It would take special effort on the part of a contributor to find the personal or business address of a candidate in order to send a direct contribution. But that would be possible even if the candidate did *not* personally sign the letter. Presumably, any contribution letter will, and should, include the name of the candidate for whom a donation is sought. With that information, the same effort could be expended by a contributor bent on sending a donation directly to the candidate. Adding a candidate's personal or facsimile signature does not alter the potential that a devoted contributor with a little time on his hands might short-circuit Canon 5's interposition of the campaign committee. At any rate, any number of other–more likely–scenarios allowing a candidate to stumble onto the names of contributors are possible, particularly since very specific information about campaign contributions are publicly available, notably on the Internet, from the Minnesota Campaign Finance and Public Disclosure Board. A chance meeting with a supporter

-43-

the source of funds contributed in response to a request transmitted to large assemblies of voters. So, the solicitation clause's proscriptions against a candidate personally signing a solicitation letter or making a blanket solicitation to a large group, does not advance any interest in impartiality articulated as a lack of bias for or against a party to a case.

### b. Openminded Judges and the Narrow Tailoring of the Solicitation Clause

We next consider whether the solicitation clause as applied by Minnesota serves an interest in impartiality articulated as "openmindedness." Put another way, would allowing a judicial candidate to personally sign outgoing solicitation letters, or to ask a large audience to support particular views through their financial contributions, in some way damage that judge's "willing[ness] to consider views that oppose his preconceptions, and remain open to persuasion, when the issues arise in a pending case"? White, 536 U.S. at 778. We think not. Given that Canon 5 prevents a candidate from knowing the identity of contributors or even non-contributors, to believe so would be a "challenge to the credulous." Id. at 780. Thus, Minnesota's solicitation clause seems barely tailored to in any way affect the openmindedness of a judge. Accordingly, the solicitation clause, as applied by Minnesota, cannot pass strict scrutiny when applied to a state interest in impartiality articulated as openmindedness.

---

who has made a contribution or viewed such information could just as easily result in the supporter commenting to the candidate about contributors to the campaign. This is, at least, no more conjecture than assuming that a contributor will send a contribution directly to a candidate as a result of the candidate's signature on the letter.

## III.  CONCLUSION

In <u>White</u>, the Supreme Court invalidated the announce clause and remanded the case to this court.  Upon further consideration of the partisan-activities and solicitation clauses in light of <u>White</u>, we hold that they likewise do not survive strict scrutiny and thus violate the First Amendment.  We therefore reverse the district court, and remand with instructions to enter summary judgment for Appellants.

LOKEN, Chief Judge, concurring in part and dissenting in part.

I concur in Parts I, II.B, II.C, II.D.1, and II.D.2 of the opinion of the court.  I concur in Part IV of Judge John R. Gibson's dissent and therefore dissent from the holding that Appellants are entitled to summary judgment invalidating the solicitation clauses.  I otherwise concur in the judgment of the court.

COLLOTON, Circuit Judge, with whom GRUENDER and BENTON, Circuit Judges, join, concurring in part and concurring in the judgment.

I concur in Parts I, II.B, II.C introduction, II.C.2, II.D introductory text, II.D.1, II.D.2.a, II.D.2.c, II.D.3, and III of the opinion of the court, and in the judgment of the court.

JOHN R. GIBSON, Circuit Judge, with whom McMILLIAN and MURPHY, Circuit Judges, join, dissenting.

The Court today strikes down the partisan activities clauses and the solicitation restriction as a matter of law, by summary judgment, ruling that the interests at stake are not compelling and that the clauses of Canon 5 are either too broad, or not broad enough, to justify their own existence.  Preserving the integrity of a state's courts and those courts' reputation for integrity is an interest that lies at the very heart of a state's ability to provide an effective government for its people.  The word "compelling" is

hardly vivid enough to convey its importance. The questions of whether that interest is threatened by partisan judicial election campaigns and personal solicitation of campaign contributions, and whether the measures Minnesota has adopted were crafted to address only the most virulent threats to that interest, are in part factual questions, which we should not decide on summary judgment. Finally, the Court today adopts an approach to strict scrutiny that would deny the states the ability to defend their compelling interests, no matter how urgent the threat. For these reasons, I respectfully dissent.

I.

The partisan activities clauses and the solicitation restriction each serve an interest that is and has been recognized as compelling–protecting the judicial process from extraneous coercion.

A.

In the district court, the Minnesota Boards argued that the state's compelling interest was in protecting judicial independence and impartiality, concepts that were not further defined, perhaps because the Boards considered their meaning apparent. When the announce clause was before the Supreme Court, the opinion authored by Justice Scalia determined that further definition and analysis were essential in order to determine whether impartiality was a compelling state interest and whether the announce clause was narrowly tailored to serve that interest. Republican Party of Minn. v. White, 536 U.S. 765, 775 (2002). Justice Scalia divined three possible meanings for judicial "impartiality." The last meaning was "open-mindedness." Id. at 778.

> This quality in a judge demands, not that he have no preconceptions on legal issues, but that he be willing to consider views that oppose his preconceptions, and remain open to persuasion, when the issues arise in

-46-

a pending case. This sort of impartiality seeks to guarantee each litigant, not an <u>equal</u> chance to win the legal points in the case, but at least <u>some</u> chance of doing so.

<u>Id.</u> (emphasis in original). Because the announce clause was "woefully underinclusive" to serve any interest in judicial open-mindedness, Justice Scalia concluded that Minnesota had not adopted the announce clause in order to further such an interest; he therefore found it unnecessary to consider whether preserving "judicial open-mindedness" was a compelling state interest. <u>Id.</u> at 778-80. Since <u>White</u>, the New York Court of Appeals has held that judicial open-mindedness is a compelling interest because "it ensures that each litigant appearing in court has a genuine–as opposed to illusory–opportunity to be heard." <u>In re Watson</u>, 794 N.E.2d 1, 7 (N.Y. 2003).

After <u>White</u>, by order of December 9, 2003, the Minnesota Supreme Court created an Advisory Committee to review its Canons 3 and 5 in light of <u>White</u>. <u>In re Amendment of the Code of Judicial Conduct</u>, No. C4-85-697, slip op. at 1 (Minn. Sept. 14, 2004) (recounting history). The Committee received public comment and held a hearing. Report of the Advisory Committee to Review the Minnesota Code of Judicial Conduct and the Rules of the Board on Judicial Standards, Acknowledgements (April 15, 2004). Following the Committee's report, the Minnesota Supreme Court held its own hearing and received public comment. <u>In re Amendment of the Code of Judicial Conduct</u>, No. C4-85-697, slip op. at 1 (Minn. Sept. 14, 2004). In September 2004, the Minnesota Supreme Court amended Canon 5 to add a definition of impartiality that explicitly includes open-mindedness:

> "Impartiality" or "impartial" denotes absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintaining an open mind in considering issues that may come before the judge.

Canon 5E (as amended Sept. 14, 2004).

The Court today discusses open-mindedness as if the concern were to protect judicial candidates from experiences that would affect their subjective frame of mind. Thus, the Court holds that the state's interest cannot be served by measures that only limit the candidate's conduct during a campaign, not before: "The few months a candidate is ostensibly purged of his association with a political party can hardly be expected to suddenly open the mind of a candidate who has engaged in years of prior political activity." Slip op. at 30-31.

This answers the easy question but ignores the hard one. The threat to open-mindedness at which the partisan activities and solicitation clauses aim comes not from within the candidates, but from without and consists of the candidates placing themselves in debt to powerful and wide-reaching political organizations that can make or break them in each election. This is a fundamental distinction between the partisan activities and solicitation clauses, on the one hand, and the announce clause, which was at issue in White. A central tenet of Justice Scalia's opinion in White was that the announce clause regulated a candidate's relation to issues, not people. See 536 U.S. at 776 (The announce clause "does not restrict speech for or against particular parties, but rather speech for or against particular issues.").[17] The partisan activities and solicitation clauses regulate how certain speech affects a judicial candidate's relations with people, and organizations of people, not the candidate's relations with issues.

---

[17]One of the chief differences between the opinion of the Court in White and the dissents was that the dissents considered the announce clause to affect the candidate's relationship with supporters in a significant way, whereas Justice Scalia did not. Compare 536 U.S. at 782 (Scalia, J.) (judge who changes position stated in campaign no more vulnerable than any other judge who rules in a way disliked by the public) with id. at 800 (Stevens, J., dissenting) (candidate who announces views is telling electorate, "Vote for me because I believe X and I will judge cases accordingly.") and id. at 816 (Ginsburg, J., dissenting) (judge who fails to honor campaign promises may be thought to have betrayed supporters).

Our Court's concern with temporal underinclusiveness, slip op. at 30-31, is largely a result of its failure to address the threat to open-mindedness from external pressure. The threat to open-mindedness results from allowing the candidates to incur obligations during a campaign that can affect their performance in office. Once a person becomes a candidate, the significance of his relations with the party changes radically, as the party becomes empowered to play the role of judge-maker. Any regulation that governed relations with the party before a person had become a candidate would be overly broad, but a regulation that focuses on the campaign period is tailored to address the threat in the time-frame in which the threat is most overt.

Similarly, the Court today dismisses the danger of bias from partisan involvement in judicial campaigns even in cases in which the political parties are litigants, on the ground that the only relevant link between the judge and the party is that both have espoused similar positions on "particular issues embraced by the political party." Slip op. at 25. To the contrary, once the partisan activities clauses are gone, having espoused similar positions on issues will be the least significant aspect of the party's relationship to its successful candidate; the truly significant point is that the candidate may owe his or her accession to the bench to the litigant before the bar and may be similarly dependent on that litigant for any hope of success in future elections. Once the partisan activities clauses are gone, one may expect that party involvement will become the norm, so that recusal would be pointless, since all judges would be similarly compromised.

B.

"Open-mindedness," in Justice Scalia's terminology, is in reality simply a facet of the anti-corruption interest that was recognized in Buckley v. Valeo, 424 U.S. 1, 26-27 (1976), and subsequent campaign finance cases. See FEC v. Nat'l Conservative PAC, 470 U.S. 480, 496-97 (1985) (referring to "preventing corruption

-49-

or the appearance of corruption" as "legitimate and compelling government interests"); FEC v. Nat'l Right to Work Comm., 459 U.S. 197, 208 (1982) (importance of avoiding corruption has never been doubted and is linked to "the integrity of our electoral process" and the responsibility of the citizen for the successful functioning of that process). Allowing those responsible for the various branches of government to contract obligations inconsistent with the discharge of their public duties threatens the republic created by the Constitution; a republic designed so that it could not protect itself from such a threat would contain the seeds of its own destruction. See Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 390 (2000) ("Leave the perception of impropriety unanswered, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance.").

Corruption is a sufficiently serious threat to our institutions that the government may (1) seek to prevent it before it happens and (2) act against it in intermediate forms that are more subtle than bribery and explicit agreements. See McConnell v. FEC, 540 U.S. 93, 144, 150-54 (2003) (corruption and appearance of corruption extend beyond bribery to other arrangements which create "sense of obligation" in or "undue influence" over officeholders); Shrink Missouri Gov't PAC, 528 U.S. at 389 ("In speaking of 'improper influence' and 'opportunities for abuse' in addition to 'quid pro quo arrangements,' we recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors. These were the obvious points behind our recognition that the Congress could constitutionally address the power of money to 'influence governmental action' in ways less 'blatant and specific' than bribery."); Nat'l Right to Work Comm., 459 U.S. at 210 ("Nor will we second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared.").

Admittedly, the concern with corruption in the campaign finance cases focuses on payment of money. While the solicitation clause also deals with money-raising, the partisan activities clauses do not, which distinguishes them from the campaign finance cases. Nevertheless, the Supreme Court's decision in United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548 (1973), demonstrates that the concern with corruption and undue influence is not limited to obligations resulting from payments of money. Letter Carriers recognized the danger partisan allegiances posed to neutral administration of justice. That case upheld restraints imposed by the Hatch Act on executive branch employees' political activities, in part because of the effect partisanship could have on the performance of their duties:

> It seems fundamental in the first place that employees in the Executive Branch of the Government, or those working for any of its agencies, should administer the law in accordance with the will of Congress, rather than in accordance with their own or the will of a political party. They are expected to enforce the law and execute the programs of the Government without bias or favoritism for or against any political party or group or the members thereof. A major thesis of the Hatch Act is that to serve this great end of Government–the impartial execution of the laws–it is essential that federal employees, for example, not take formal positions in political parties, not undertake to play substantial roles in partisan political campaigns, and not run for office on partisan political tickets. Forbidding activities like these will reduce the hazards to fair and effective government.

413 U.S. at 564-65. Accord In re Raab, 793 N.E.2d 1287, 1290-91 (N.Y. 2003) (per curiam). Letter Carriers shows that what kind of obligations may be considered inconsistent with government office depends on the nature of the office in question. Where the office requires "impartial execution of the laws," partisan entanglements can be inconsistent with the demands of the office. Letter Carriers and the campaign finance cases are not separate lines of authority, but are closely connected, since the Supreme Court relied heavily on Letter Carriers in identifying and defining the anti-corruption interest in Buckley v. Valeo, 424 U.S. at 27.

-51-

The Republican Party of Minnesota argues that the holding of <u>Letter Carriers</u> is irrelevant here because "the role of judges is closer to the role of legislators than [the] executive branch bureaucrats" affected by <u>Letter Carriers</u>. Supplemental brief of Oct. 22, 2002 at 6 n.6. The Supreme Court in <u>White</u> specifically avoided equating the judicial office with the legislative: "[W]e neither assert nor imply that the First Amendment requires campaigns for judicial office to sound the same as those for legislative office." 536 U.S. at 783.

The need for "neutrality" identified in <u>Letter Carriers</u> is even more important for the judicial branch than the executive. A long line of cases stresses the right of litigants to a neutral adjudicator. In <u>Marshall v. Jerrico, Inc.</u>, 446 U.S. 238, 242 (1980), Justice Marshall wrote:

> The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process. The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. At the same time, it preserves both the appearance and reality of fairness, "generating the feeling, so important to a popular government, that justice has been done," by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him.

(citations omitted).

The circumstances that can result in violation of the due process right to a neutral judge are not limited to situations in which a judge has a pecuniary interest at stake in the litigation. In <u>Ward v. Village of Monroeville</u>, 409 U.S. 57 (1972), due

process was violated when the defendant was convicted by the mayor of a village that depended on fines collected in the mayor's court. The mayor himself did not share in the revenues, but the Supreme Court held:

> [T]he test is whether the mayor's situation is one "which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused . . . ." [quoting Tumey v. Ohio, 273 U.S. 510, 532 (1927).] Plainly that "possible temptation" may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court. This, too, is a "situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial," [and] necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him.

Id. at 60. Other cases in which a judge's neutrality was intolerably compromised by non-pecuniary considerations include Johnson v. Mississippi, 403 U.S. 212, 215-16 (1971) (judge who had previously lost a civil rights suit to defendant could not try defendant for contempt); In re Murchison, 349 U.S. 133 (1955) (judge who acts as "one-man judge-grand jury" cannot then try indicted defendant); and Offutt v. United States, 348 U.S. 11, 17 (1954) (judge who had become "personally embroiled" with lawyer could not try the lawyer for contempt). There is no easily applied formula for deciding when a judge has an impermissible interest in litigation; "Circumstances and relationships must be considered." Murchison, 349 U.S. at 136. But even at a point where the judge cannot be said to be actually biased, "[O]ur system of law has always endeavored to prevent even the probability of unfairness." Id. (emphasis added).

We do not have to conclude that adjudication by judges who were selected without the protections of the partisan activities clauses violates the due process rights of the litigants. Indeed, we could not well do so, since, as the Supreme Court remarked in White, partisan judicial elections were common in the mid-nineteenth

-53-

century, when the Fourteenth Amendment was adopted. See White, 536 U.S. at 785 ("[J]udicial elections were generally partisan during this period [nineteenth and early twentieth centuries], the movement toward nonpartisan judicial elections not even beginning until the 1870's."). Currently, some fifteen states maintain partisan judicial elections for at least some of their judges, American Judicature Society, Judicial Selection in the States: Appellate and General Jurisdiction Courts (2004); see Suessman v. Lamone, 862 A.2d 1, 19 (Md. 2004) (Maryland circuit court primaries are held to be partisan), and no one contends that the states may not choose this method of selection.

Nevertheless, the participation of judges who have been allowed or forced to make themselves dependent on party largesse for their continued tenure affects the state's ability to provide neutral judges and the public's perception of such neutrality. The state has a compelling interest in keeping its judges free from the odor of self-interest or partisanship. In Cox v. Louisiana, 379 U.S. 559 (1965), Cox was convicted of picketing near a courthouse "with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty" after he demonstrated in protest against the arrest of students who would be tried by judges present at the courthouse during the demonstration. Id. at 560, 564-65. The law did not prohibit all picketing, but picketing done with the intent to influence the administration of justice. Cf. Carey v. Brown, 447 U.S. 455, 460-63 (1980) (prohibiting picketing for one purpose while allowing it for another is content discrimination). The Supreme Court stated that it was unlikely that the picketing would actually affect the judges' decisions in the students' cases. Cox, 379 U.S. at 565. The Court did not suggest that if the state had allowed the picketing, it would have caused a due process violation for any particular litigant. However, the Court said, "A state may protect against the possibility of a conclusion by the public under these circumstances that the judge's action was in part a product of intimidation and did not flow only from the fair and orderly working of the judicial process." Id. Thus, the state's interest in preserving the appearance of neutrality justified the restriction on expressive conduct.

-54-

Accord In re Chmura, 608 N.W.2d 31, 40 (Mich. 2000) ("state's interest . . . extends to preserving public confidence in the judiciary"). Cf. Letter Carriers, 413 U.S. at 565 ("[I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent.").

The New York Court of Appeals recently confirmed that a state has a compelling interest in presenting the appearance as well as the fact of due process:

> [L]itigants have a right guaranteed under the Due Process Clause to a fair and impartial magistrate and the State, as the steward of the judicial system, has the obligation to create such a forum and prevent corruption and the appearance of corruption, including political bias or favoritism.

In re Raab, 793 N.E.2d 1287, 1290-91 (N.Y. 2003) (per curiam).

In its September 2004 deliberations about whether to amend the partisan activities clauses of Canon 5, the Minnesota Supreme Court articulated just those concerns outlined above. The court stated:

> [T]he goal of an impartial judiciary is compelled by the due process rights of litigants. Due process requires decisionmakers who are fair, unbiased, and impartial, and importantly, decisionmakers who are perceived as such by the litigants who appear before them. See Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825 (1986); In re Raab, 793 N.E.2d 1287, 1290-91 (N.Y. 2003) (per curiam). Moreover, we cannot underestimate the importance of the public's perception that judges are fair, unbiased, and impartial to the continued respect for and legitimacy of the judicial branch. See Mistretta v. United States, 488 U.S. 361, 407 (1989). Without this perception, the public's confidence and support cannot be maintained and the very independence of the judicial branch mandated by the Constitution will be threatened.

In re Amendment of the Code of Judicial Conduct, No. C4-85-697, slip op. at 4-5 (Minn. Sept. 14, 2004).  These concerns fit within the concept of judicial open-mindedness, and they are a compelling state interest.

C.

Although in White Justice Scalia observed that the parties and this Court appeared to make no distinction between the concepts of judicial "independence" and "impartiality," 536 U.S. at 775 n.6, in its September 14, 2004 order, the Minnesota Supreme Court explained its decision not to amend the partisan activities clauses partly by relying on the need for separation of powers:

> [T]he separation of powers inherent in the creation of three distinct branches of government, one of which is the judicial branch, in article III, section 1 of the Minnesota Constitution provides the constitutional underpinning for the independence of the Minnesota judiciary.  As the executive and legislative branches are inextricably intertwined with partisan politics, maintenance of an independent judicial branch is reliant on the freedom of its officials from the control of partisan politics.

In re Amendment of the Code of Judicial Conduct, No. C4-85-697, slip op. at 4-5 (Minn. Sept. 14, 2004).  The separation of powers interest is a concern for institutional independence that is distinct from concern for impartiality in any of the senses identified by Justice Scalia.

Separation of powers is a concept basic to the states' constitutions as well as the federal Constitution.  A state's choice of how to organize its government is "a decision of the most fundamental sort for a sovereign entity."  See Gregory v. Ashcroft, 501 U.S. 452, 460 (1991) (authority of the people of the states to determine qualifications of important state officials is such a decision).  Even the narrowest

-56-

notion of federalism requires us to recognize a state's interest in preserving the separation of powers within its own government as a compelling interest.

## D.

The extent and severity of the threat to the state's interests are factual questions that must be proven empirically. See Shrink Mo. Gov't PAC, 528 U.S. at 390-94. In the proceedings in the district court, the Boards adduced sufficient evidence of that threat so that summary judgment for the plaintiffs would not have been appropriate. But recent events make it far less appropriate that our Court should enter judgment as a matter of law on questions of fact as to which there is no record before us.

The record below contained the affidavit of a former governor of Minnesota who stated that he had a lifetime of experience in understanding how Minnesota citizens "think and feel" and that partisan judicial campaigns would lessen Minnesotans' confidence "in the independence of the judiciary." A former Chief Justice of the Minnesota Supreme Court stated that partisan judicial campaigns would "put pressure on judges to decide cases in ways that would impress the judge's supporters favorably."

But far more important to our holding today is the fact that the Minnesota Supreme Court has recently reconsidered the provisions of Canon 5 at issue here, held hearings, and received public comment. It is a matter of interest that the parties in this case, in briefing and argument, made no mention of this development. As the canon was reconsidered, amended in part and reiterated in part while this case was pending on rehearing, failure to consider the effect of these developments may well cause this Court's opinion to be moot from its inception.

This suit seeks a permanent injunction; the relief the Court orders today does not merely look to the past, when the district court record was made, but operates in

the present and into the future.  See Stuart Minor Benjamin, Stepping Into the Same River Twice: Rapidly Changing Facts and the Appellate Process, 78 Tex. L. Rev. 269, 276-77 (1999) (where relief is prospective, appellate court should respond to changes in facts that affect validity of legal ruling).  The Supreme Court in a number of cases has made clear that we must consider on appeal any change, either in fact or in law, which has supervened since the judgment was entered.  The Court in Ashcraft v. Tennessee, 322 U.S. 143, 156 (1944), stated: "In disposing of cases before us it is our responsibility to make such disposition as justice may require.  'And in determining what justice does require, the Court is bound to consider any change, either in fact or in law, which has supervened since the judgment was entered.' Patterson v. Alabama, 294 U.S. 600, 607 [1935]; State Tax Commission v. Van Cott, 306 U.S. 511, 515-16 [1939]."

The Advisory Committee appointed by the Minnesota Supreme Court to study the issue concluded that there was a threat to the state's interest that required regulation of partisanship in judicial campaigns: "In considering the need for restrictions on the political activity of judicial election candidates, the Advisory Committee is also cognizant of the experience of actual or perceived corruption of the judiciary in states that permit partisan judicial elections."  Report of the Advisory Committee to Review the Minnesota Code of Judicial Conduct and the Rules of the Board on Judicial Standards, Comments-Canon 5, No. C4-85-697 (Minn. April 15, 2004).  While we do not have access to the evidence before the Committee, widely available and publicized evidence substantiates the fear that the majority of the public believes that partisanship does influence the decisions of state courts.  For instance, a poll conducted in 1999 showed that 81% of the respondents agreed that "politics influences court decisions." National Center for State Courts, How the Public Views the State Courts 41 (1999).  The Advisory Committee recommended deleting the party identification and the attend and speak clauses on narrow tailoring grounds.  Advisory Committee Report at Comments–Canon 5.  After receiving the Committee report and conducting a hearing and receiving public comment, the Minnesota

Supreme Court decided to retain all three partisan activities clauses. In re Amendment of the Code of Judicial Conduct, No. C4-85-697 (Minn. Sept. 14, 2004).

The Advisory Committee unanimously recommended against changing the ban on the judicial candidate's personal solicitation of campaign contributions. Advisory Committee Report at Canon 5B(2)–Personal Solicitation of Campaign Contributions. Again, widely available poll numbers support the Committee's conclusion that solicitation of campaign contributions carries with it a significant threat to the state's interest in freedom from external coercion of judges. For example, "a recent Wisconsin poll found that more than three-quarters of those surveyed believe that campaign contributions from lawyers and plaintiffs in high-profile cases influence the decisions of these judges in court," and a study in Texas "found that 83 percent of the public and 79 percent of lawyers believe that campaign contributions have a significant influence on a judge's decision." Alexander Wohl, Justice for Rent, The American Prospect (May 22, 2000). A summary of poll results compiled by the National Center for State Courts reported on fifteen recent polls, showing not only that the public believes campaign contributions affect judicial decisions, but also that lawyers and even judges agree. For instance, a poll from Texas showed that 48% of state appellate and trial judges surveyed believed that campaign contributions had a fairly significant or very significant degree of influence over judicial decisionmaking. National Center for State Courts, Summary of Responses to Public Opinion Survey Questions Concerning Judicial Campaign Fundraising (July 28, 2004). A Pennsylvania survey of registered voters showed that 95% of those surveyed believed that judges' decisions were influenced by large contributions to their election campaigns at least some of the time. Id. This is the kind of evidence that would substantiate the threat to judicial open-mindedness (and the appearance of it) from partisan obligations and from judicial campaign fund-raising.

The Court today errs grievously in issuing a ruling that strikes the provisions based on the 1997 factual record without considering the September 2004 record

before the Minnesota Supreme Court.  Cf. Ashcroft v. ACLU, 542 U.S. 656, 124 S. Ct. 2783, 2794 (2004) (taking into account technological changes in internet filtering since time of district court's findings).  Since the holding is based on a factual record that antedates the most recent version of Canon 5, one must question whether the Court's holding today even applies to the current version of Canon 5, based as it is, on a 2004 factual determination which the Court does not take into account.

E.

The Court today holds that Minnesota's interest in judicial open-mindedness is not a compelling interest because the solicitation and partisan activities clauses are "underinclusive," meaning that they do not address all "significant threats" to the state's asserted interest.  Slip op. at 32.  The Court today says that underinclusiveness of a regulation will establish that the state's purported interest is not compelling:

> A clear indicator of the degree to which an interest is 'compelling' is the tightness of the fit between the regulation and the purported interest: where the regulation fails to address significant influences that impact the purported interest, it usually flushes out the fact that the interest does not rise to the level of being 'compelling.'

Slip op. at 17.  This is only partly correct and the part that is correct is not relevant to our case.

Where the governmental actor asserts an interest that has not been previously recognized as compelling and either the importance of the interest or the urgency of the threat to the interest is debatable, adoption of a regulation that is only partly effective may show that the governmental actor can, indeed, live with the problem. Where the state's asserted interest is previously unrecognized as compelling and is not self-evidently vital to the state's ability to function as intended in the Constitution, then the state's own lack of zeal or care in protecting the interest does

-60-

argue that the asserted interest should not be considered paramount to individuals' First Amendment rights.

However valid that reasoning may be in cases where the asserted interest is novel or questionable, it is not valid here because the interests at stake in this case have already been recognized as compelling. Compelling interests cannot be negated simply because a particular measure adopted in their name is deemed ineffective. The Court today acknowledges that avoiding judicial bias that denies litigants due process is a compelling interest, whether or not a particular measure furthers it effectively.[18] Likewise, protecting the integrity of the states' courts has long been recognized as compelling, and by the same reasoning, that interest cannot be negated simply because a particular measure may not protect it fully. As Justice Kennedy wrote in his concurrence in White:

> Here, Minnesota has sought to justify its speech restriction as one necessary to maintain the integrity of its judiciary. Nothing in the Court's opinion should be read to cast doubt on the vital importance of this state interest. Courts, in our system, elaborate principles of law in the course of resolving disputes. The power and the prerogative of a court to perform this function rest, in the end, upon the respect accorded to its judgments. The citizen's respect for judgments depends in turn upon the issuing court's absolute probity. Judicial integrity is, in consequence, a state interest of the highest order.

536 U.S. at 793. It is a misreading of the Supreme Court's underinclusiveness discussions, and, most significantly, a nonsequitur as well, to say that the interest in judicial integrity could be reduced to insignificance because Canon 5 does not go far enough to protect it.

---

[18]"It can hardly be argued that seeking to uphold a constitutional protection, such as due process, is not per se a compelling state interest." Slip op. at 22.

F.

Preserving judicial open-mindedness, and the appearance of it, should be recognized as the same compelling state interest in avoiding corruption interest that was identified in Buckley v. Valeo and the campaign finance cases. Though it is the same anti-corruption interest, the need to protect that interest is more urgent and vital in the context of the judiciary because in that context outside influences threaten litigants' due process interest in adjudication in accord with the law and the facts of their case. A further state interest in preserving the separation of powers between state branches of government should also be recognized as compelling. The Minnesota Supreme Court has recently re-examined Canon 5 and clarified that the Canon is meant to protect those state interests. Judicial integrity and separation of powers are interests of the highest importance in guaranteeing the proper functioning of state government and we have no warrant to deny their importance.

II.

A.

Though the Court today errs in holding that underinclusiveness of a regulation can negate the importance of the state's interest in the integrity of its judiciary, underinclusiveness does indeed point to a different problem–it raises an inference of pretext. Even where an asserted governmental interest is undeniably compelling, a failure to fully address threats to that compelling interest can be evidence of pretext. The governmental actor may have missed the target because it was not aiming at it, but was actually seeking to accomplish some other, impermissible goal, such as viewpoint discrimination. In such a case, underinclusiveness of a regulation does not cast doubt on whether the asserted interest is compelling, but whether it is genuine. See Johnson v. California, 125 S. Ct. 1141, 1156 (2005) (Stevens, J., dissenting) (failure to take measures that would be more effective at addressing prison violence

-62-

than challenged regulation "undercuts the sincerity" of the state's concern about violence).  This is the same point Justice Scalia made in White when he quoted his earlier words, "[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited," Republican Party of Minnesota v. White, 536 U.S. 765, 780 (2002) (quoting Florida Star v. B.J.F., 491 U.S. 524, 541-42 (1989) (Scalia, J., concurring in judgment)), and spoke of a "challenge to the credulous."  White, 536 U.S. at 780.

The Supreme Court has twice upheld speech restrictions on strict scrutiny review where the measure was tailored to address only the most critical threat to the governmental interest, even where some threat to the asserted interest remained unaddressed.  See Austin v. Michigan State Chamber of Commerce, 494 U.S. 652 (1990), and McConnell v. FEC, 540 U.S. 93 (2003).  In Austin, Michigan restricted the political expenditures of corporations in support of or opposition to candidates for state office. The compelling interest for such regulation was the concern that entities that amassed wealth in the economic marketplace would parlay that wealth into "unfair advantage in the political marketplace," id. at 659, because their ability to spend corporate money bore no relation to political support for the ideas the corporations spent their money to promote, id. at 659-60 (opinion of Court) and 670, 672 (Brennan, J., concurring).  The Chamber of Commerce attacked the Michigan law as underinclusive because it did not regulate expenditures by unincorporated labor unions, which also amassed political war chests.  Id. at 665.

Austin rejected the underinclusiveness challenge, reasoning that the corporations enjoyed greater government-conferred legal advantages enhancing their ability to accumulate wealth.  494 U.S. at 665.  These legal advantages of corporate form made a crucial distinction between corporations and unions.  Id. at 666 ("Michigan's decision to exclude unincorporated labor unions from the scope of § 54(1) is therefore justified by the crucial differences between unions and

-63-

corporations."). Additionally, case law permitted union members to opt out of contributing to the union's political activities, which meant that "the funds available for a union's political activities more accurately reflects members' support for the organization's political views than does a corporation's general treasury." Id. The Michigan law therefore passed strict scrutiny.

The Supreme Court also upheld a statute on strict scrutiny review despite an underinclusiveness attack in its recent campaign finance case, McConnell v. FEC. In McConnell, the Court considered a challenge to section 203 of the Bipartisan Campaign Reform Act of 2002, which in turn amended section 316(b)(2) of the Federal Election Campaign Act of 1971, to prohibit use of corporations' and unions' treasury funds to pay for certain kinds of election advertising. 540 U.S. at 204 & n. 87. Because the provision restricted expenditures rather than contributions, it had to be tested by strict scrutiny. Id. at 205 (asking whether "compelling governmental interest justifies" measure); id. at 330 (Kennedy, J., dissenting) ("All parties agree strict scrutiny applies [to section 203]."). The plaintiffs contended that the section was underinclusive because it did not apply to election advertising in the print media or on the Internet. Id. at 207. The Court held that the evidence in the case supported the conclusion that television advertising posed the greater threat, and therefore, "The record amply justifie[d] Congress' line drawing." Id. at 208. The Court said that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." Id. at 207-08 (quoting Buckley v. Valeo, 424 U.S. 1, 105 (1976)). McConnell confirms that the sort of underinclusiveness that is fatal in strict scrutiny is arbitrary underinclusiveness, not underinclusiveness that results from attempting to focus the restriction on only the severest form of the threat to a compelling governmental interest.

A content-based restriction was also upheld on strict scrutiny review despite an underinclusiveness challenge in Burson v. Freeman, 504 U.S. 191, 207 (1992). Freeman contended that a statute restricting campaign activity within 100 feet of the

polls on election day was underinclusive because it did not restrict other types of speech, including commercial solicitation and exit polling. The Court rejected that attack because there was "simply no evidence that political candidates have used other forms of solicitation or exit polling to commit . . . electoral abuses." Id. Thus, whether the statute was impermissibly underinclusive depended on the evidence about the extent and severity of the threat to the state's asserted interest.

B.

The question at issue in our consideration of the partisan activities clauses, as in Austin, is whether there is a "crucial difference," 494 U.S. at 666, in the threat posed by some entities that justified regulating them while leaving others unregulated. To rebut the inference of pretext, the government must show that the speech it has burdened poses a different, more serious threat to its asserted interest than the speech it chose not to regulate. See Erznoznik v. City of Jacksonville, 422 U.S. 205, 215 (1975) ("[E]ven a traffic regulation cannot discriminate on the basis of content unless there are clear reasons for the distinctions."); Eugene Volokh, Freedom of Speech, Permissible Tailoring and Transcending Strict Scrutiny, 144 U. Penn. L. Rev. 2417, 2423 (1966) ("[A] law is not narrowly tailored if it fails to restrict a significant amount of speech that harms the government interest to about the same degree as does the restricted speech.") (emphasis added); In re Dunleavy, 838 A.2d 338, 351 (Me. 2003) ("Canon 5(A)(1)(e) is narrowly tailored to meet [state's interest in avoiding bias] because it applies only to conduct which presents the greatest risk to that interest . . . ."), cert. denied, 541 U.S. 960 (2004).

Recently, the Supreme Court has held that the differences between political parties and other interest groups could warrant differential regulation of the two kinds of groups. This distinction between political parties and other interest groups was at issue in McConnell, where the Court considered Title I of the Bipartisan Campaign Reform Act, which imposed restrictions on political parties' fund-raising activities

-65-

that were not imposed on interest groups, such as the National Rifle Association, the American Civil Liberties Union or the Sierra Club. The plaintiffs contended that the distinction violated Equal Protection. The Court held the distinction was permissible, because

> Congress is fully entitled to consider the real-world differences between political parties and interest groups when crafting a system of campaign finance regulation. Interest groups do not select slates of candidates for elections. Interest groups do not determine who will serve on legislative committees, elect congressional leadership, or organize legislative caucuses. Political parties have influence and power in the legislature that vastly exceeds that of any interest group . . . . Congress' efforts at campaign finance regulation may account for these salient differences.

540 U.S. at 188 (citation omitted).[19]

Before the district court, the Boards contended that special restrictions on judicial candidates' reliance on political parties were necessary to protect Minnesota's tradition of non-partisan judicial elections, which dates from the enactment in 1912 of the statute making Minnesota judicial elections non-partisan. See 1912 Minn. Laws, Spec. Sess., ch. 2; Peterson v. Stafford, 490 N.W.2d 418, 422 (Minn. 1992) (discussing history of Minnesota's judicial elections).

---

[19]As Dean Briffault has observed:

> The "special relationship" between parties and officeholders that the Court recognized in McConnell can also threaten judicial independence by too closely linking judges to party leaders and the preferences of those leaders, even in cases in which neither the party leaders nor the party itself are participating.

Richard Briffault, Judicial Campaign Codes after Republican Party of Minnesota v. White, 153 U. Penn. L. Rev. 181, 232 (2004). This substantiates the threat to the separation of powers interest discussed in section IC, supra.

The Minnesota Supreme Court greatly amplified that explanation when it decided to reject the Advisory Committee's proposed revisions to the partisan activities clauses in September 2004. The supreme court order stated, "We conclude that the restrictions on partisan political activity contained in our Code of Judicial Conduct are too important to undermine based on the possibility that they may be vulnerable to constitutional attack, particularly as we are convinced that there are sound bases for their constitutional validity." In re Amendment of the Code of Judicial Conduct, No. C4-85-697, slip op. at 2-3 (Minn. Sept. 14, 2004). The court then reviewed the history of Minnesota's commitment to non-partisan judicial elections. Id. at 3-4.

The movement towards non-partisan judicial elections was a reform movement meant to insulate judges from the party machines that had captured the state courts during the late nineteenth and early twentieth centuries. F. Andrew Hanssen, Learning About Judicial Independence: Institutional Change in the State Courts, 33 J. Legal Studies 431, 448-50 (2004). Between 1910 and 1958, eighteen states adopted non-partisan judicial elections. Id. at 436. Among states that elect their judges, the majority use nonpartisan elections; currently, twenty states have nonpartisan elections for at least some of their judgeships, as opposed to fifteen who have at least some partisan elections.[20] American Judicature Society, Judicial Selection in the States: Appellate and General Jurisdiction Courts (2004); see Suessman v. Lamone, 862 A.2d 1, 19 (Md. 2004) (Maryland circuit court primaries are held to be partisan). Among the states with non-partisan judicial elections, there

_____

[20]Some states have both partisan and non-partisan elections for different offices; in this dissent they are counted as both partisan and non-partisan election states. Some states have hybrid systems in which candidates are nominated through party primaries or conventions, but appear without party designation on the general election ballot. These hybrid-system states are here counted as partisan election states, following the classification used by the American Judicature Society. See American Judicature Society, Judicial Selection in the States: Appellate and General Jurisdiction Courts (2004).

is a wide variety of measures to enforce the non-partisan character of the election; some states have few such measures, but many have measures similar to those at issue here.[21]  Thus, the idea that non-partisan campaigns might protect the judiciary from

_____

[21]Of the twenty states with at least some non-partisan judicial elections, nine have restrictions of some kind on stating party affiliation, and one forbids actual party affiliation.  Ark. Code of Jud. Cond., Canon 5A(1)(f) and 5C(1)(a)(iii) (candidate may privately, but not publicly, identify self as affiliated with political party); Fla. Code of Jud. Cond., Canon 7C(3) ("The candidate should refrain from commenting on the candidate's affiliation with any political party . . . ."); Ky. Supreme Court Rule 4.300, Canon 5A(2) ("A judge or candidate shall not identify himself or herself as a member of a political party in any form of advertising, or when speaking to a gathering.  If not initiated by the judge or candidate for such office, and only in answer to a direct question, the judge or candidate may identify himself or herself as a member of a particular political party."); Minn. Code of Jud. Cond., Canon 5A(1)(a); Miss. Code Ann. § 23-15-973 ("It shall be unlawful for any candidate for any of the offices mentioned in this section to align himself with . . . any political faction or any political party at any time during any primary or general election campaign."); Nev. Code of Jud. Cond., Canon 5C(1)(ii) (candidate may identify party "upon request"); Ore. Code of Jud. Cond., Canon 4-102(C) (judicial candidate shall not knowingly "[p]ublicly identify the judicial candidate for the purpose of election, as a member of a political party other than by registering to vote or as allowed by ORS 249.015."); S.D. Code of Jud. Cond., Canon 5C(1)(a)(ii) (judge may identify self as member of political party "for voting purposes only"); Wash. Code of Jud. Cond., Canon 7(A)(1)(e) (judicial candidates shall not "identify themselves as members of a political party, except as necessary to vote in an election."), enforced In re Kaiser, 759 P.2d 392, 400 (Wash. 1988); Wis. S. Ct. Rule 60.06(2)(b) (judicial candidates shall not be a member of any political party).

Arkansas and Florida allow speaking at party gatherings only if the candidate's opponent is also invited to speak.  Ark. Code of Jud. Cond., Canon 5 C(1); Fla. Code of Jud. Cond., Canon 7C(3).

Three other states directly or indirectly prohibit a candidate from seeking party endorsement.  Ark. Code of Jud. Cond., Canon 5A(1)(d); Idaho Code of Jud. Cond., Canon 5A(1)(d); Miss. Code Ann. § 23-15-973 ("It shall be unlawful for any candidate . . . to align himself . . . with any political faction or any political party . .

improper external pressures is hardly a novel idea, but must be placed within a broad national reform movement that still has significant sway within the states.

The partisan activities clauses at issue here were adopted in 1997 as part of an effort to clarify and formalize Minnesota's tradition of non-partisan elections and to supplement the guidance given by the non-partisan election statute. The mere omission of party names from the ballot apparently does little to make campaigns non-partisan, as shown by the situations in Ohio and Michigan, where ostensibly non-partisan general elections are preceded by vigorous partisan campaigns. See American Bar Ass'n Commission on the 21st Century Judiciary, Justice in Jeopardy 17 (2003) ("Even states with ostensibly nonpartisan general elections for judges, such as Michigan and Ohio, have experienced highly politicized races when two-party competition is fierce and the party affiliations of the candidates are widely known."); id. at 77 ("States with true nonpartisan elections, such as those in Wisconsin, must therefore be distinguished from states such as Michigan, where the political parties nominate candidates to run in ostensibly nonpartisan general elections, which in fact have been very partisan indeed."); Anthony Champagne, Political Parties and Judicial Elections, 34 Loy. L. A. L. Rev. 1411, 1415-16 n.16 (Michigan, Ohio, and Idaho have non-partisan ballots but partisan campaigns). M. DePaul Willette, Executive Secretary of the Board on Judicial Standards, stated to the Minnesota Supreme Court, "The nonpartisan nature of Minnesota's judicial elections have been taken for granted. But a search of the statutes and rules showed there is, in fact, very little, if any, specific language describing what nonpartisan elections are." Comments to the Minnesota Supreme Court, No. C7-81-300 at 2 (Nov. 14, 1997). Willette's commentary on the proposed amendments to Canon 5, which contained the three partisan activities clauses at issue here, shows that the Board was animated by a desire to effectuate more completely the non-partisan election statute and formalize the tradition of non-partisan elections that the Board believed was not adequately protected by existing Minnesota law. One of the changes made to Canon 5 in 1997

. .").

was to include the statement, "Each justice of the supreme court and each court of appeals and district court judge is deemed to hold a separate nonpartisan office. MS 204B.06 Subd. 6." Canon 5A (1997). The Board on Judicial Standards announced in proposing the amendments that they were meant to protect Minnesota's "long tradition of nonpartisan judicial elections." Comments to the Minnesota Supreme Court, No. C7-81-300 at 4 (Nov. 14, 1997).

The hearing the Minnesota Supreme Court held before the 1997 amendments to Canon 5 included consideration of whether partisan activities restrictions should be limited to political parties as defined in Canon 5 or whether they should apply to other advocacy groups. There was testimony on both sides of that issue. In addition to the testimony of Judge Meyer (which the Court quotes at slip op. 36-37 n.13) and others against the definition adopted, DePaul Willette testified:

> Let's assume that the rule is not in place and two candidates in a race; one is endorsed by the republican party, one is endorsed by the democratic party. What do we have? We have a party race. It's not a nonpartisan contest. We have a party contest which will lead us, in my judgment, to the kind of fund-raising and the problems that Illinois and Texas are facing today with multi-million dollar budgets for people who want to retain or gain judicial positions.

Hearing before the Minnesota Supreme Court on Amendment to Canon 5 of the Code of Judicial Conduct, at 20-21 (Nov. 17, 1997).

Willette's testimony also refutes the idea that the Minnesota Supreme Court intentionally failed to address the threat from partisan activity by single-issue interest groups. Willette testified that one reason single-issue interest groups were not included in the partisan activities clauses is that single-issue groups would require a commitment that would have been banned under the announce clause at the time. See id. at 12-13. Obviously, the announce clause can no longer play any role in the regulatory scheme; however, the Minnesota Supreme Court's expectation that the

-70-

announce clause would serve to moderate a candidate's relation with interest groups was reasonable at the time and therefore tends to show that the partisan activities clauses were effective at the time adopted. Moreover, the invalidation of the announce clause has apparently had a profound effect on the pressures on judicial candidates in that it is apparently now common for organizations to send judicial candidates questionnaires asking them to state their positions on an array of disputed legal issues. See, e.g., North Dakota Family Alliance, Inc. v. Bader, 361 F. Supp. 2d 1021, 1027 (D.N.D. 2005) (example of "voter's guide" questionnaire submitted to judicial candidates in North Dakota, including items asking candidate to agree or disagree with statements such as: "I believe that the North Dakota Constitution does not recognize a right to homosexual sexual relationships" and "I believe that the North Dakota Constitution does not recognize a right to abortion."). In light of the invalidation of the announce clause, I believe a remand for further evidence on the issue of pretext would be more appropriate than for us to order summary judgment on a record with evidence supporting both sides of the question.

Once again, the most pertinent evidence about the thinking behind the current Canon 5 is evidence that has not yet been presented to the district court. The Advisory Committee in 2004 reviewed McConnell and other Supreme Court case law and concluded:

> In the Advisory Committee's view, there is ample support for Canon 5's current limitation of the political activity restrictions to political party activities, while leaving unregulated candidate activities relating to special interest or other groups that do not rise to the level of a political party. As noted above, McConnell itself clearly supports the validity of this limitation in order to promote the compelling interests in judicial impartiality, independence, and appearance of impartiality and independence.

Advisory Committee Report, Comments-Canon 5. The Committee reasoned that parties differ from other interest groups in the degree of symbiosis that exists between

-71-

candidate and party and in the unique role that political parties play in the workings of the other branches of government.  Id.  Finally, the Committee concluded that recusal was not an adequate remedy for the problems posed by partisan involvement in judicial elections because recusal requests depend on the parties' ability to know all relevant facts, because recusal involves significant administrative costs, and because it may simply be inadequate to counteract the damage to the reputation of the judiciary from the appearance of institutional partiality.  Id.  The Committee later noted that a minority within the committee had been concerned that the restrictions were underinclusive in failing to address special interest and other political groups, but that "the Committee as a whole acknowledges that it would be difficult to draft a workable rule to limit involvement by special interest or other political groups for a number of reasons."  Id. at Application of the Code of Judicial Conduct.

McConnell demonstrates that the distinction between political parties and other interest groups could be defended as a valid response to "salient differences" between the kind of threat each sort of organization poses to the state's interests.  In addition to its institutional experience with non-partisan judicial elections since 1912, in 1997 the Minnesota Supreme Court had before it some evidence validating the distinction between political parties and other interest groups, and some challenging that distinction.  It resolved that conflict, concluding that political parties posed the greater threat.  The conclusion was reaffirmed in 2004 by a committee of lawyers and scholars charged with the task of scrutinizing Canon 5 for constitutional problems, and later by the Minnesota Supreme Court.  Our Court errs in concluding as a matter of law that the distinction between political parties and other interest groups is pretextual.  The evidence as to this distinction is best considered by the district court on remand.

III.

Our Court's underinclusiveness analysis goes astray by failing to recognize a compelling interest and by failing to allow the Boards to rebut the inference of pretext. Sections I & II, supra. But the signal failing of the Court's underinclusiveness analysis is that it envisions a kind of strict scrutiny[22] that simply cannot work when applied to real cases because it does not take into account the need for limited deference to the state's attempt to solve the problems that besiege it.

"Deference" is not a word we associate with strict scrutiny review, but there is indeed a place for limited deference, as shown in the recent case of Grutter v. Bollinger, 539 U.S. 306, 328 (2003) ("The Law School's educational judgment that such diversity is essential to its educational mission is one to which we defer."). There are three reasons why we should employ some limited deference to the judgment of the state of Minnesota in this case, if after remand, we were satisfied that

_____

[22]Whether strict scrutiny should be applied to the solicitation clause is not entirely free from doubt. In an amicus brief filed in this en banc rehearing, the Conference of Chief Justices argues that the personal solicitation ban regulates contributions to a political candidate and therefore should not be subjected to strict scrutiny, but to the lesser standard appropriate to campaign contribution limitations. Conference of Chief Justices' brief at p. 16. This argument finds support in McConnell v. FEC, 540 U.S. 93, 138-41 (2003), which applied the less rigorous scrutiny when reviewing a law restricting national political parties' ability to solicit contributions. See also Richard Briffault, Judicial Campaign Codes after Republican Party of Minnesota v. White, 153 U. Pa. L. Rev. 181, 225-26 (2004) ("The restriction on personal solicitation by a candidate should be subject to the same less rigorous standard of review as the restriction on contributions."). Because the parties have assumed the same level of scrutiny would apply to the solicitation clause as to the other provisions of Canon 5, neither the panel opinion in Kelly, 247 F.3d 854 (8th Cir. 2001), nor that on remand, 361 F.3d 1035, 1048-50 (8th Cir. 2004), entertained the possibility that the contributions standard should apply. Though the argument is worthy of more attention, I will follow the parties and our Court in assuming the proper standard is strict scrutiny.

the judgment was well-supported by cogent evidence and the possibility of pretext had been rebutted.

The Court's primary reason for striking the partisan activities clauses today is that the provisions are underinclusive. The main thrust of the narrow-tailoring requirement is directly to protect speech rights by avoiding an infringement broader than the need to protect the government's interest: "The purpose of the test is to ensure that speech is restricted no further than necessary to achieve the goal, for it is important to assure that legitimate speech is not chilled or punished." Ashcroft v. ACLU, 542 U.S. 656, 124 S. Ct. 2783, 2791 (2004). Exacting, de novo review by the courts to assure that the government has chosen the least restrictive alternative directly protects the individual's speech right. The objection that a measure is underinclusive, on the other hand, cuts in the opposite direction; it being the command of the First Amendment not to abridge the freedom of speech, one is at first surprised to learn that a law can offend the First Amendment because the law does not forbid enough speech. The vice in an underinclusive law is not that the underinclusiveness directly suppresses speech but that it raises a suspicion of pretext–which is just an inference, and which can be rebutted by sufficient evidence. Even in questions subject to strict scrutiny, there simply has to be some room for judgment about how wide to cast the net, and it should be apparent that it is more offensive to the First Amendment for a measure to be too broad than to be too narrow. The problem with applying the same kind of exacting, de novo review to underinclusiveness as we do to overinclusiveness is that the two requirements form a Catch 22 situation, in which a drafter's very effort to avoid overinclusiveness makes the measure vulnerable to attack for underinclusiveness.[23]

_____

[23]The overinclusive-underinclusive trap is illustrated in the advice given to would-be drafters of revisions to state canons of judicial ethics that general language can be attacked as vague or overbroad, but specific provisions make the canon vulnerable to charges of underinclusiveness. See J.J. Gass, After White: Defending and Amending Canons of Judicial Ethics 23 (Brennan Center for Justice 2004).

In McConnell, even when applying strict scrutiny, the Court acknowledged the need for "legislative choice" and "Congress' line drawing." 540 U.S. at 207-08. Thus, when considering the argument that the restrictions on corporations' and unions' expenditures for "electioneering communications" were underinclusive because they did not extend to print or internet advertising, the Court quoted Buckley in stating that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." Id. The Court rejected the argument that the restriction on expenditures for electioneering communications was underinclusive because it did not include print or internet ads; in order to respond to the problem at all, Congress had to be able to draw lines somewhere: "One might just as well argue that the electioneering communication definition is underinclusive because it leaves advertising 61 days in advance of an election entirely unregulated." Id. at 208. The Court considered it obvious that someone had to decide whether the restrictions should take effect 60 days or 61 days in advance of the election; if Congress had to be able to show that the problem was utterly eradicated by the 60-day limit and no part of the problem persisted by allowing the same conduct on the 61st day, the legislation would, of course, have failed.

A second reason for some limited deference is that this is a case of competing constitutional interests, so that whatever protection is afforded First Amendment interests comes at the expense of due process and separation of powers interests. See In re Raab, 793 N.E.2d 1287, 1292 (N.Y. 2003) ("[A] number of competing interests are at stake, almost all of a constitutional magnitude. Not only must the State respect the First Amendment rights of judicial candidates and voters but also it must simultaneously ensure that the judicial system is fair and impartial for all litigants, free of the taint of political bias or corruption, or even the appearance of such bias or corruption."); Roy Schotland, Myth, Reality, Past and Present, and Judicial Elections, 35 Ind. L. Rev. 659, 665 (2002) ("Referring to constitutional rights [in judicial election context], without even mentioning due process, is stunning shallowness."). In the order promulgating the September 2004 version of Canon 5, the Minnesota

Supreme Court made this very point: "The goal of maintaining an independent and impartial judiciary is not merely a policy choice, but embodies constitutional principles that are properly counterbalanced against the First Amendment interests that are affected by regulation of elections." In re Amendment of the Code of Judicial Conduct, No. C4-85-697, slip op. at 4 (Minn. Sept. 14, 2004). Where "constitutionally protected interests lie on both sides of the legal equation," Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 400 (2000) (Breyer, J., concurring), adoption of an only partly effective regulation may simply be the result of an unavoidable necessity to accommodate conflicting constitutional mandates.

Finally, this is a case in which the parameters of the evil addressed cannot be outlined with a high degree of precision. The difficulty is that the threat to the governmental interest is not from unambiguously evil conduct, but from behavior that forms part of a continuum with desired behavior–attempts of the citizenry to make their voices heard in their government. The critical and difficult question posed by this case is that the danger to judicial neutrality comes from that sometimes salutary behavior, at the point at which participation in the democratic process becomes undue influence over judicial decisionmaking, preventing a judge from acting as the law's representative, rather than as the representative of a political patron or donor. That point will vary from candidate to candidate, according to whether he or she is stubborn or persuadable, experienced or naive, young or old, poor or independently wealthy, ambitious or modest. No law can account for all these imponderables without restricting some candidate who would not have been swayed by temptation or leaving some candidate at liberty to compromise himself.

The Supreme Court acknowledged the same problem in the context of political contribution and expenditure restrictions. The use of money to influence elections and hence, government policy, is not simply either wholesome activism or influence-buying–the same action can partake of both, which is why someone has to decide when a contribution or expenditure goes from being civic activism to a bid for undue

influence. For that reason, the Supreme Court has said that regulation of political contributions and expenditures can go beyond forbidding outright bribery to regulation of more subtle forms of conduct that pose the same kind of threat, but in a lesser degree or in a more ambiguous form. This was debated in <u>McConnell</u>, where the dissenters contended that bribery laws ought to be enough to protect the government's anti-corruption interest, <u>see</u> 540 U.S. at 266 (Thomas, J., concurring and dissenting) and 540 U.S. at 258 (Scalia, J., concurring and dissenting) and 540 U.S. at 292-98 (Kennedy J., concurring and dissenting), but the Court's opinion held that the anti-corruption interest "extends beyond simple cash-for-votes corruption to curbing 'undue influence on an officeholder's judgment,'" 540 U.S. at 150. When Congress grapples with such a protean concept as "undue influence on an officeholder," the Supreme Court applies strict scrutiny in such a way as to acknowledge that Congress' task requires exercise of some judgment. In contrast to the Supreme Court's approach, our Court today takes a bludgeon to a state's attempt to solve a delicate problem.

IV.

The futility of requiring unattainable precision is illustrated by our Court's treatment of the solicitation clause. The basic scheme of the solicitation clause is to erect the campaign committees as a barrier between the candidate and contributor. As recently as 2002, all but four of the states that had judicial elections prohibited candidates from personally soliciting campaign contributions. Roy Schotland, <u>Myth, Reality, Past and Present, and Judicial Elections</u>, 35 Ind. L. Rev. 659, 666 (2002). (Since <u>White</u>, several states have amended their rules.[24]). The Court today seems to

---

[24]Twenty-four states currently prohibit personal solicitation, while six states allow it. The states that now prohibit personal solicitation by the candidate are: Arizona, Ariz. Rule 81, Code of Jud. Cond., Canon 5B(2); Arkansas, Ark. Code of Jud. Cond., Canon 5C(2); Florida, Fla. Code of Jud. Cond., Canon 7C.(1); Idaho, Id. Code of Jud. Cond., Canon 5C(2) (may not solicit "in person"); Illinois, Ill. Code of Jud. Cond., Canon 7B(2); Indiana, Ind. Code of Jud. Cond., Canon 5C(2); Kansas,

implicitly approve the concept of the campaign committee as a barrier between contributors and the judge or would-be judge. Yet, in effectuating the concept, there are necessarily details which could be moved an inch one way or another. It is clear that for the candidate to sign letters himself is one way to hack at the wall between the candidate and contributor–presumably, that is why Wersal wants to do it. It is perhaps true that the entire wall would not fall down, but it would be somewhat less effective in achieving the goal of removing personal obligation from the candidate-contributor relation. If each detail of the scheme must be proved as critical, rather

---

Kan. S. Ct. Rule 601, Code of Jud. Cond., Canon 7B(2)(c); Kentucky, Ky. Rule 4.300, Code of Jud. Cond., Canon 5B(2); Louisiana, La. Code of Jud. Cond., Canon 7D(1); Michigan, Mich. Code of Jud. Cond., Canon 7B(2); Minnesota, Minn. Code of Jud. Cond., Canon 5B(2); Mississippi, Miss. Code of Jud. Cond., Canon 5C(2); Missouri, Mo. S. Ct. Rule 2.03, Canon 5B(2); New York, N.Y. Judiciary Law, Book 29 App., Canon 5A(5); North Dakota, N.D. Code of Jud. Cond., Canon 5C(2); Ohio, Ohio Code of Jud. Cond., Canon 7(C)(2)(a); Oklahoma, Okla. Code of Jud. Cond., Canon 5C(2); Oregon, Ore. Code of Jud. Cond. R.4-102(D); Pennsylvania, 42 Pa. Cons. Stat. Ann., Code of Jud. Cond., Canon 7(B)(2); South Dakota, S.D. Code of Jud. Cond., Canon 5C(2); Tennessee, Tenn. S.Ct. Rules, Rule 10, Code of Jud. Cond., Canon 5C(2)(a); Washington, Wash. Code of Jud. Cond., Canon 7B(2); West Virginia, W. Va. Code of Jud. Cond., Canon 5C(2); and Wisconsin, Wis. S. Ct. Rule 60.06(4).

States that permit personal solicitation are: California, Cal. Code of Jud. Ethics, Canon 5 (comment.); Georgia, Ga. Code of Jud. Cond., Canon 7B(2) (amended to comply with Weaver v. Bonner, 309 F.3d 1312 (11th Cir. 2002)); Maryland, Md. Rules 16-813, Canon 5 (rescinded effective July 1, 2005); Montana, Mont. Canons of Jud. Ethics; Nevada, Nev. Code of Jud. Cond., Canon 5C(2); New Mexico, N.M. Code of Jud. Cond. R. 21-800B and F (candidates may solicit but not from attorneys or litigants with cases pending before the candidate); North Carolina, N.C. Code of Jud. Cond., Canon 7(B)(4) (amended in response to White, see Matthew Eisley, Election Rules Relaxed for Judges: Permission to Solicit Lawyers for Money Brings a Fear of 'Shakedowns', 26 Nat'l L.J. No. 7 (Oct. 13, 2003)); and Texas, Tex. Code of Jud. Cond., Canon 4D(1). Alabama adopted a rule in 2004 that does not prohibit but "strongly discourages" personal solicitation. Ala. Canons of Jud. Ethics, Canon 7B(4).

than as forming a part of a scheme that works, then each detail, and therefore the scheme as a whole, is foredoomed.

Moreover, while the Court's ruling today seems to attack only one small aspect of the solicitation-restriction scheme, the ruling contains the seeds to strike the whole scheme. Today Wersal asks only to sign solicitation letters himself and to personally ask for money from large groups. However, the Court states that any candidate can flank the campaign committee's confidentiality obligation simply by looking up public records showing who contributed to whom. In light of the Court's underinclusiveness analysis, this reasoning will likely require us to condemn the entire scheme as soon as the next plaintiff asks us to.

In sum, though strict scrutiny must, of course, be strict, it must, at least in some instances, be applied with limited deference to the decisionmaker's exercise of judgment. If we pretend that it is otherwise, we adopt a model for strict scrutiny under which no state's attempt to deal with certain problems can survive, and so very real and dangerous problems must be left unaddressed. Every place where the line is drawn is arguably either overinclusive, because too much activism is restricted, or underinclusive, because too much threat to judicial open-mindedness is tolerated. The courts then occupy the enviable position of not being required to say in advance what line would be permissible, but of being privileged to veto every possible legislative attempt to draw the line because it would have been possible to draw the line somewhere else. If strict scrutiny is simply a way to strike down laws, in which any law is doomed as soon as we invoke strict scrutiny, it is a charade. That is not how the Supreme Court has applied strict scrutiny,[25] nor should we adopt this flawed methodology in our Circuit. Instead, where the states or other branches draw the line in a place which the governmental actor can defend, with convincing evidence, as the place where the threat to its interest becomes the most acute, the measure should pass

---

[25]"Strict scrutiny is not 'strict in theory but fatal in fact.'" Grutter v. Bollinger, 539 U.S. at 326.

strict scrutiny, though it might have been possible for another hypothetical decisionmaker to have moved the line an inch in one direction or another.

## V.

There can be no question that the interests at stake here are compelling. There are questions of fact–first, as to whether the threat to those interests posed by partisan involvement in judicial elections and personal solicitation of contributions are severe enough to warrant the measures taken by the Minnesota Supreme Court and second, as to whether the particular remedy chosen was truly selected for the asserted reason. I would remand to the district court for trial of these factual questions in light of new evidence of the Minnesota Supreme Court's most recent deliberations on the subject. If the defendants prove by convincing evidence that the threat was as they assert and that the clauses were adopted to remedy that threat, I believe the clauses should be upheld as constitutional. Today's ruling invalidates Minnesota's current attempts to preserve its courts' integrity and public repute without any evidence having been heard on the most recent rule amendments. At the same time, our ruling in effect dooms any future attempt as well by adopting a form of strict scrutiny that no measure will pass. I therefore respectfully dissent.

————————————————